WILLIAM CODY KELLY, Trustee, Under Trust Dated December 12, 1962, Appellant/Cross-Respondent, *v.* TAHOE REGIONAL PLANNING AGENCY, Respondent/Cross-Appellant, and THE STATE OF CALIFORNIA; THE STATE OF NEVADA; JOHN K. VAN DE KAMP, Attorney General of the State of California, and FRANKIE SUE DEL PAPA, Attorney General of the State of Nevada, Respondents.

No. 22913

July 8, 1993                                   855 P.2d 1027

Thomas J. Hall, Reno; Hibbs, Roberts, Lemons, Grundy & Eisenberg, Reno, for Appellant/Cross-Respondent.

Crowell, Susich, Owen & Tackes, Carson City, for Respondent/Cross-Appellant.

Frankie Sue Del Papa, Attorney General, Brian Chally, Senior Deputy Attorney General, Carson City; Daniel E. Lungren, Attorney General, Richard M. Skinner, Deputy Attorney General, Richard M. Thalhammer, Deputy Attorney General, State of California, for Respondents.

## OPINION

*Per Curiam:*

Appellant and cross-respondent William Cody Kelly ("Kelly") appeals the district court's judgment concluding that the Tahoe Regional Planning Agency land-use regulations did not deprive him of all economically viable use of his property and, therefore, did not effect a taking under the Fifth and Fourteenth Amendments of the United States Constitution requiring payment of just compensation. We affirm the district court's judgment.

In addition, respondent and cross-appellant Tahoe Regional Planning Agency ("TRPA") cross-appeals the district court's judgment that a prior federal district court decision confirming Kelly's "deemed approved" status of Uppaway Estates, including its excess land coverage variance, also exempted Kelly from compliance with the 1987 Plan IPES regulations. We conclude that the district court properly confirmed that Uppaway Estates, including the excess land coverage variance, was "deemed approved" via the federal district court order; we, however, also conclude that the district court erred when it interpreted "deemed approved" status to mean that Kelly was exempt from compliance with all current TRPA land-use regulations and that Kelly could commence building immediately. We, therefore, affirm in part and reverse in part.

The appeal and cross-appeal will be discussed in separate sections of this opinion.

### FACTS

#### BACKGROUND

Lake Tahoe Basin rests over 6,000 feet above sea level and

occupies approximately 320 square miles along the Nevada-California border. Lake Tahoe, the focal point of the basin, is "ultraoligotrophic," extremely clear with low concentrations of nutrients which support the growth of water-clouding algae. Evidence indicates that until recently, Lake Tahoe had a 10,000-year history of near equilibrium in the gain or loss of nutrients. Surface and subsurface flows from Lake Tahoe's numerous watersheds introduce nutrients to Lake Tahoe. The amount of nutrients, especially nitrogen, carried to the lake depends upon the soils, vegetation and land-use within each watershed.

Impervious cover and surface disturbance of soil in the Lake Tahoe Basin impede the soil's natural function as a medium for growth of vegetation and storage of nutrients. Vegetation is responsible for removing nutrients, particularly nitrogen, from precipitation, and therefore, plays an important role in the Lake Tahoe Basin ecosystem. Absent vegetation, erosion increases sediment loads to Lake Tahoe, thus storing nutrients in the lake, rather than in the watershed where they belong. In addition, impervious cover prevents the infiltration of precipitation, which results in heightened runoff.

Presently, Lake Tahoe is suffering an increase in algal productivity and a decline in clarity due to an elevated load of sediments and nutrients. As a result, Lake Tahoe and its tributaries are experiencing a downward trend in water quality. Sediment-caused disturbance of the lake's natural nutrient-loading equilibrium has resulted in an accelerated eutrophication of its once-pristine waters: a decline in annual average depth of visibility, a decline in water clarity, and a corresponding increase in algae. As the fertility of the system increases, Lake Tahoe is losing nearly half a meter per year of transparency.

Appellant and cross-respondent William Cody Kelly owns seven hilltop lots ("Hilltop Lots"), the subject of this lawsuit, which overlook Lake Tahoe at Glenbrook, Nevada. In 1974, in an attempt to gain approval of the development of Kelly's Hilltop Lots, as well as thirty-two additional lots on the forty-four acres at Uppaway Estates ("Uppaway"),[1] Kelly submitted to the Douglas County Planning Commission a subdivision "information report," which the Planning Commission subsequently approved. Thereafter, the Douglas County Board of County

---

[1]Uppaway Estates was a thirty-nine lot planned unit development to be constructed in three phases, of which Lots 33 through 39 comprised Phase III. Kelly described the development in the information report as a "*sited* parcel land sale program." Most of Uppaway Estates was considered "high hazard," Class 1 capability, and limited to one percent land coverage. Kelly proposed a "variance" of approximately seven percent coverage in the one percent areas, including the Hilltop Lots.

Commissioners approved the tentative map and issued an administrative permit to allow land coverage in excess of that permitted by Tahoe Regional Planning Agency ("TRPA") Land Capability Districts. Kelly then took the tentative map and administrative permit to TRPA Governing Board for review. The Governing Board held three separate hearings, and the ensuing vote resulted in a lack of dual majority,[2] which, under the language of the 1969 Tahoe Regional Planning Agency Compact ("1969 Compact") at that time, resulted in approval.[3]

In 1975, TRPA filed suit in the United States District Court in an attempt to annul the Douglas County administrative permit. The United States District Court "deemed approved" the Douglas County administrative permit in a Court Memorandum and Order. In October 1975, Federal District Judge Bruce R. Thompson confirmed this "deemed approved" status in a memorandum and order, in *Tahoe Reg. Planning Agency v. Douglas County, et. al.*, Civil No. R-75-130. In the memorandum and order, Judge Thompson deemed the Uppaway Estates project, including land coverage in excess of the maximum amount for the property, approved by Douglas County through the issuance of a variance.

The TRPA Compact was amended in 1980,[4] and two plans, the 1984 Plan and the 1987 Plan, have since been implemented in an

---

[2]When the TRPA Governing Board reviewed the Uppaway Estates project, it received five negative votes from the California delegates, two negative votes and two affirmative votes from the Nevada delegates. One Nevada delegate was absent.

[3]Under the 1969 Compact, TRPA enacted a land use regulatory scheme requiring that local governments issue permits for projects in accordance with TRPA's regional standards in order to conserve resources and maintain an orderly development of the land. Further, the 1969 Compact required TRPA to review permits for major developments and variances, and TRPA's authority to approve or deny a permit was contingent on its obtaining a dual-majority vote of the Governing Board.

The TRPA Governing Board consisted of ten members, five from each state, and a majority vote of the members present representing *each* state was "required to take action with respect to any matter." If TRPA did not "take final action" on a project within sixty days after the application was delivered to it, the project was "deemed approved." Hence, if a project received the approval of a majority of one state's delegation to the Governing Board but the denial by the other, there would be no "action," and the project would be "deemed approved."

[4]In December 1980, Nevada and California, with Congressional approval, extensively amended the 1969 Compact. The amended compact ("1980 Compact"; Publ. L. 96-551, 94 Stat. 3233 (1980); NRS 277.200; Cal. Gov. Code § 66801) dramatically changed TRPA's composition, functions and duties. Prescribing a governing board consisting of fourteen members, the 1980 Compact enacted stricter project-review provisions. The 1980 Compact mandated that TRPA approve all projects, and no project could be approved unless found to comply with the regional plan and the ordinances of TRPA.

effort to comply with the 1980 Compact. Since the 1980 Compact, Kelly has been unable to gain TRPA approval for the development of his Hilltop Lots.

On or about July 20, 1981, Robert Lahmann ("Lahmann"), vice-president of Uppaway Development Company, contacted TRPA with proposed modifications to the Hilltop. Lahmann proposed moving various lots, eliminating some lots and converting the rail access system (funicular) to the Hilltop into a roadway.

On October 29, 1981, TRPA specifically notified Kelly of the fact that the Hilltop portion of Uppaway had been rated as "in need of further consideration." TRPA evaluated Uppaway and determined that Phases I and II were "potentially adequate" and that Phase III was rated as being "in need of further consideration" because the subdivision improvements as to Phase III had not yet been constructed. TRPA also advised Kelly of the method for appeal of the determination. On December 23, 1981, TRPA notified Lahmann by letter that it had reviewed his proposal and that the proposal would have to be submitted in the form of an application to modify the Uppaway map and improvement plans.

On January 21, 1982, TRPA notified Kelly again of the Phase III evaluation and again advised Kelly of the appeal procedure. These notifications advised Kelly that he could not proceed with a case-by-case review of the Hilltop Lots until Phase III received a rating of "adequate" or "potentially adequate."

During 1982, TRPA adopted its Environmental Threshold Carrying Capacities as mandated by the 1980 Compact. Included in those thresholds were standards for water quality, both in Lake Tahoe and in its feeder streams, and for soil conservation, including the amount of impervious surface that could be created without stress upon the environment.

On July 27, 1982, Kelly submitted applications for case-by-case review concerning Lots 33 through 38, inclusive, but never filed an appeal concerning Phase III's rating of "in need of further consideration." During the fall of 1982, numerous applications had been filed in the case-by-case review office. On December 30, 1982, Douglas County issued residential building

In addition, the new compact mandated that TRPA adopt environmental thresholds in order to protect Lake Tahoe.

On August 25, 1981, TRPA Ordinance 81-5 went into effect implementing the Lake Tahoe Regional Water Quality Management Plan. Under the terms of this ordinance, TRPA now required a "case-by-case" system of review of single-family development on land within the State of Nevada. Ordinance 81-5 permitted case-by-case review of lots within subdivisions classified as "adequate" or "potentially adequate." The ordinance required a team of experts to evaluate all subdivisions to determine their eligibility for either classification. Subdivisions classified as "in need of further consideration," those lacking substantial construction of roads, utilities or drainage structures, were not eligible for the case-by-case program.

permits for Lots 33 through 38. Each building permit, however, was subject to the *explicit condition* that the construction plans be approved by TRPA.

On January 24, 1983, TRPA notified Kelly that on-site inspection of the lots would have to be delayed due to the heavy snowfall that year. TRPA continued its attempts to complete the case-by-case review of the lots during the summer of 1983. On July 21, 1983, TRPA offered to work specifically with Kelly in an attempt to obtain an inspection of the subdivision during the summer of 1983 and to try to gain a potentially adequate rating.

On August 26, 1983, however, TRPA Governing Board adopted a moratorium preventing further evaluations of case-by-case applications, pending the adoption of an amended regional plan mandated by the 1980 Compact.[5] TRPA did advise Kelly that it would attempt to complete immediately processing of the Hilltop Lots' case-by-case applications as soon as the Governing Board lifted the moratorium.

In October 1983, Kelly's contractor completed the off-site improvements and access road to the Hilltop Lots. On December 2, 1983, Kelly's counsel advised him that, as a result of a conversation with TRPA staff, applications for the Hilltop Lots were ready to be processed, but would be required to await TRPA's adoption of the amended regional plan.

In 1987, TRPA Governing Board developed a new plan in an attempt to integrate the adopted environmental threshold carrying capacities with the policies of the 1980 Compact. In July 1987, the new plan ("1987 Plan") went into effect. In an effort to regulate the uncontrolled development that would likely ensure the permanent loss of Lake Tahoe to eutrophication in the near future, TRPA Governing Board developed the Individual Parcel Evaluation System ("IPES"). TRPA incorporated this new IPES system in the 1987 Plan. IPES satisfied the 1980 Compact requirements and was designed to direct residential development first to those areas most suitable for it, in accordance with the environmental thresholds and other considerations such as infra-

---

[5]On April 26, 1984, TRPA adopted an amended regional plan ("1984 Plan") in an attempt to comply with the mandates of the 1980 Compact. The 1984 Plan provided that completed case-by-case applications on file before August 26, 1983, would be processed under the old procedures.

On April 26, 1984, the very day the TRPA adopted the 1984 Plan, the State of California sued TRPA, alleging the plan did not comply with the 1980 Compact. On or about May 1, 1984, the federal district court agreed and issued a restraining order prohibiting TRPA from approving projects under the 1984 Plan. On August 9, 1984, the district court preliminarily enjoined TRPA from approving any projects within the basin, subject to certain limited exceptions not applicable in this case. The Ninth Circuit Court of Appeals affirmed the preliminary injunction on appeal. People of California v. Tahoe Reg. Planning Agency, 766 F.2d 1308 (1985).

structure and progress toward accomplishing water quality improvement programs.

Under IPES, TRPA sends a team of experts to evaluate each vacant single family parcel, primarily for erosion hazard and runoff potential. Each evaluated lot receives a score, and then, in each of the five counties around the Tahoe Basin, each such lot is ranked against its counterparts. Based upon a statistical formula, TRPA then establishes an initial minimum score. Those lots with scores above that minimum were eligible for development, subject to other conditions not at issue in this case; on the other hand those with scores "below the line" were required to wait for eligibility. The numerical level defining top-ranked parcels may be lowered in any local jurisdiction on an annual basis.[6] On or about January 1, 1989, TRPA Governing Board established 725 as the initial, numerical score, above which are the top-ranked parcels eligible to receive building permits.

Under the 1987 Plan, Kelly was required to have his Hilltop Lots evaluated under the 1987 Plan, which included IPES. Kelly's Hilltop Lots were evaluated under IPES[7] and Lot 36 received a score above 725. Since Lot 36 received a passing score, it became eligible immediately.

Prior to the commencement of the trial, Kelly appealed the remaining scores. Under the appeal procedure, Kelly's lots with scores below 725 were reevaluated under IPES by a new team, and new scores were issued. The appeal process, completed during the course of the trial, resulted in all but four of Kelly's lots becoming immediately eligible.[8]

---

[6]Lowering of the line is dependent upon findings by TRPA *inter alia,* that the jurisdiction has a monitoring program in place pursuant to Chapter 32 of the TRPA Code, that demonstrable progress is being made there on capital improvements for water quality and that there is a satisfactory level of compliance with conditions upon project approvals in the jurisdiction.

[7]Kelly's lots received the following scores:

| Lot No. | Score |
|---|---|
| 33 | 679 |
| 34 | 531 |
| 35 | 629 |
| 36 | 758 |
| 37 | 615 |
| 38 | 635 |

[8]The reevaluated scores were as follows:

| Lot No. | Score |
|---|---|
| 33 | 725 |
| 34 | 694 |
| 35 | 737 |
| 37 | 702 |
| 38 | 693 |

On July 24, 1987, Kelly filed suit for "Specific Performance, Inverse Condemnation, Declaratory, Injunctive and Monetary Relief and Punitive Damages" against respondent and cross-appellant TRPA, respondent State of Nevada ("Nevada"), and respondent State of California ("California"). Kelly alleged seven claims for relief.[9] On August 23, 1989, the district court granted in part and denied in part defendants' motions for summary judgment. In February 1990, Kelly proceeded to trial against TRPA on the two remaining issues: takings and substantive due process. After a five-week trial, the district court concluded the following in a tripartite ruling: (1) TRPA based the IPES system on solid scientific principles and rationally and evenly applied it; (2) TRPA's 1987 Plan and TRPA Code had not deprived Kelly of his property without compensation; and (3) although Kelly does not possess a vested right for building approvals for the Hilltop Lots, only routine aspects of the 1987 Plan and TRPA Code apply to Kelly because of Uppaway's "deemed approved" status. In addition, the district court "ratified and confirmed" the legal conclusions in its order partially granting and partially denying motions for summary judgment, except as they were inconsistent with the decision.

On July 13, 1990, the district court filed its 128-page Decision.[10] On November 5, 1991, the district court filed its findings of fact, conclusions of law and judgment consistent with its Decision.

---

[9]Kelly alleged the following: (1) temporary taking of the lots since February 26, 1981, without compensation in violation of unspecified constitutional provisions; (2) estoppel against TRPA "from denying approval" of building permits for the lots; (3) vested rights as a result of assurances by TRPA staff and an agreement, dated July 22, 1982; (4) permanent taking of the lots without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 8, of the Nevada State Constitution, resulting from TRPA's 1984 and 1987 Plans and implementing ordinances; (5) deprivation of economic use of Kelly's property without due process of law in violation of said constitutional provisions; (6) denial of equal protection of the laws as a result of the enactment of TRPA's 1987 Plan and implementing ordinances; and (7) violation of the Federal Civil Rights Act, 42 U.S.C. Section 1982.

[10]On February 20, 1991, the district court also filed a decision on post-trial motions which, with one exception, denied both Kelly's and defendants' motions for attorney's fees. The district court did allow California $7,500.00 because of Kelly's "hide and seek tactics" with respect to an expert witness. Although the district court denied Kelly's request for costs, it granted defendants' similar request, but limited those costs to costs in defense of the IPES system.

On November 5, 1991, after further hearings, the district court entered an explanatory order concerning the award of costs and Uppaway land coverage, in which, *inter alia,* the district court awarded defendants costs in the sum of $241,836.69.

## THE KELLY APPEAL

On direct appeal, Kelly's principal argument is that the district court erred in concluding that TRPA land-use regulations did not deprive him of all economically viable use of his property and therefore, did not effect a taking under the Fifth[11] or Fourteenth[12] Amendments of the United States Constitution requiring payment of just compensation. Specifically, Kelly contends that the evidence does not support the district court's conclusion that "[n]either the 1987 Regional Plan for the Lake Tahoe Basin nor the Code of Ordinances, nor any predecessor plan or ordinance, have [sic] deprived Mr. Kelly of his interest in property in a manner requiring compensation under the Fifth and Fourteenth Amendments to the United States Constitution."

"The district court's findings of fact will not be set aside unless clearly erroneous." Burrows v. Progressive Casualty Ins., 107 Nev. 779, 782, 820 P.2d 748, 750 (1991) (citing Hermann v. Varco-Pruden Buildings, 106 Nev. 564, 566, 796 P.2d 590, 592 (1990)). Further, "[w]here the trial court, sitting without a jury, makes a determination predicated upon conflicting evidence, that determination will not be disturbed on appeal where supported by substantial evidence." Trident Construction Corp. v. West Electric, Inc., 105 Nev. 423, 427, 776 P.2d 1239, 1242 (1989) (citing Dickstein v. Williams, 93 Nev. 605, 608, 571 P.2d 1169, 1171 (1977)).

Before we can determine whether the district court properly concluded that TRPA regulations did not constitute a taking, this court must first examine whether the district court erred in making an "ad hoc factual inquiry" regarding Kelly's takings claim.

Kelly contends that the district court erred in making an ad hoc factual inquiry in light of the "late-breaking" Supreme Court decision Lucas v. S. Carolina Coastal Council, ...... U.S. ......, 112 S.Ct. 2886 (1992), and that Lucas is "dispositive" of this issue because the facts in Lucas allegedly "mirror those at hand." Kelly argues that he has been deprived of all economic use of his property and, therefore, is entitled to "categorical" compensation, regardless of the state's interests.

As Kelly points out, in June 1992, the United States Supreme

---

[11]"No person shall . . . be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

[12]"No state shall . . . deprive any person of life, liberty or property without due process of law . . . ." U.S. Const. amend. XIV.

Court published *Lucas,* a decision that held, under certain circumstances, an ad hoc factual inquiry was not required and a landowner could "categorically" receive payment as compensation for a taking in violation of the Fifth and Fourteenth Amendments. *Id.* at ......., 112 S.Ct. at 2893. The Supreme Court stated the general rule regarding "takings" violations: The "Fifth Amendment is violated when a land-use regulation 'does not substantially advance legitimate state interests *or denies an owner economically viable use of his land.*'" *Id.* at ......., 112 S.Ct. at 2894 (quoting Agins v. Tiburon, 447 U.S. 255, 260 (1980)). The Court went on to say that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at ......., 112 S.Ct. at 2895 (footnote omitted).

The Supreme Court then discussed the history of "regulatory takings" jurisprudence. The Court noted that there is no "'set formula'" for determining whether a regulatory action constitutes taking, and that in the past, the Court has preferred to "'engag[e] in . . . essentially ad hoc, factual inquiries.'" *Id.* at ......., 112 S.Ct. at 2893 (quoting Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978)). The Court, however, did point out two situations where regulatory actions are "compensable without case-specific inquiry into the public interest advanced in support of the restraint": (1) "regulations that compel the property owner to suffer a physical 'invasion' of his property . . . no matter how minute the intrusion, and no matter how weighty the public purpose behind it . . . . [; and (2)] where regulation[s] den[y] all economically beneficial or productive use of land." *Id.* at ......., 112 S.Ct. at 2893.

We conclude that *Lucas* is inapplicable because the two cases, *Lucas* and the instant case, are clearly distinguishable; the similarities[13] between this case and *Lucas* are far less significant than the differences. In *Lucas,* the Act flatly prohibited any permanent structures on Lucas' residential lots; in Kelly's case, TRPA regulations do not flatly prohibit development. TRPA regulations temporarily limit, rather than forever preclude, development in environmentally sensitive areas: if a particular parcel meets the minimum IPES standard, that parcel becomes immediately eligible for development. Moreover, Kelly's Lots 35 and 36 have each received IPES scores high enough to make them immediately

---

[13]Both parties purchased undeveloped land with the intent to develop it further and for eventual re-sale. Also, in both cases, the states enacted the regulations in order to protect environmentally sensitive areas, and the regulations were enacted after the purchase of the property. Lastly, in both cases, the states enacted the regulations in order to advance a legitimate state interest.

eligible for development, and Lots 33, 34, 37 and 38 may be eligible in the future when TRPA exercises its statutorily approved authority and lowers the IPES standard. We, therefore, conclude that *Lucas* is not controlling in this case and that the district court properly conducted the required ad hoc factual inquiry weighing the state's interest against Kelly's interests.

In light of the fact that *Lucas* is inapplicable to the case at hand, this court must then determine whether the district court erred in concluding that TRPA regulations did not effect a "temporary taking" of Kelly's Hilltop Lots. In Keystone Bituminous Coal Assn. v. DeBenedictis, 480 U.S. 470, 495 (1987), the Supreme Court noted that it has been unable to develop a set formula for the resolution of takings claims, and, therefore, it has mandated an "ad hoc factual inquiry" process to resolve takings issues. *Id.* at 495. Under this inquiry, this court must evaluate (1) whether the district court properly concluded that TRPA regulations substantially advanced a legitimate government interest and (2) whether that government interest outweighed Kelly's private interest in developing the Hilltop Lots.

First, the district court properly concluded that TRPA regulations substantially advanced a legitimate government interest: the protection of Lake Tahoe Basin—a national treasure. In its findings of fact, the district court noted that the 1969 Compact's stated purpose was "to maintain an equilibrium between the region's natural endowment and its man-made environment" and to establish and "areawide planning agency [TRPA] with power to adopt and enforce a regional plan of resource conservation and orderly development." The district court concluded that TRPA regulations are a "valid exercise of police power." We conclude that such governmental purposes have long been recognized as legitimate governmental interests. *See* Agins v. Tiburon, 447 U.S. 255, 261 (1980); Penn Cent. Transp. Co. v. New York City, 438 U.S. 104 (1978).

Second, the district court, after weighing the competing interests of both Kelly and TRPA, properly determined that TRPA land-use regulations did not deprive Kelly of all economically viable use of his property. *See Agins,* 447 U.S. at 260-61 ("Although no precise rule determines when property has been taken . . . the question necessarily requires a weighing of private and public interests.") In order to determine whether Kelly has been deprived of all economically viable use of his property, three essential factors must be considered in the weighing process: (1) economic impact of land-use regulations, which includes a valuation analysis; (2) interference of land-use regulations with

landowner's reasonable investment-backed expectations; and (3) character of government action. Keystone Bituminous Coal Assn. v. DeBenedictis, 480 U.S. 470, 495 (1987) (quoting Hodel v. Virginia Surface Mining and Recl. Assn., 452 U.S. 264, 294-95)).

When considering the first factor, we note that Kelly's lots remain valuable assets.[14] Kelly's own appraiser testified to the fact that the Hilltop Lots maintained substantial value during the period of time in question. Furthermore, Uppaway must be viewed as a whole, not as thirty-nine individual lots when determining whether Kelly has been deprived of *all* economic use. *See* Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 130 (1978) ("Takings jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated."). When viewed as a whole, we conclude that Kelly has not been deprived of all economic use; only the seven Hilltop Lots have been affected by TRPA's regulations, not the entire Uppaway subdivision. Moreover, at this point in time, the current IPES standard only precludes four of the seven lots from being eligible for development, and those lots are expected to receive approval within the next few years.[15]

When considering the second factor, Kelly's reasonable investment-backed expectations have been satisfied. At the time Kelly purchased Uppaway Estates in 1966, he had adequate notice that his development plans might be frustrated. At the time of the land purchase, the Lake Tahoe Regional Planning Commission had published the *Report of the Lake Tahoe Joint Study Committee,* and it discussed California and Nevada's concerns over rapid growth in the Lake Tahoe Basin and the need for land-use planning regulations. Moreover, Kelly's financial expectations have also been met because he purchased the original estate for $500,000.00, lived in the main house for nearly twenty years and then sold the main house alone for $1,100,000.00. Kelly also developed and sold most, if not all, of the parcels, with the exception of the seven Hilltop Lots, yielding him a substantial profit.[16]

---

[14]During oral argument, Kelly's counsel estimated the value of the Hilltop Lots to be between two and four million dollars.

[15]TRPA regulations contain a provision that allows the IPES "cut-off" level to be lowered on an annual basis which, if the IPES "cut-off" number was lowered, the remaining three lots would receive building approval.

[16]During oral argument, Kelly's counsel admitted that Kelly had already received approximately 5.6 million dollars from prior sales within Uppaway.

When considering the third factor, the district court properly found that the actions of TRPA were not only for the public benefit, but for Kelly's benefit as well. Specifically, the district court stated in its decision that "every single one of Mr. Kelly's lots will eventually diminish in value if Lake Tahoe is despoiled. IPES is a burden, surely, but it also conveys significant *personal benefits* to each landowner it serves."

In weighing these three factors, we conclude that the district court properly determined that TRPA can postpone building in critical areas for a "reasonable period of time" as long as the "benefit received by the property from the ordinances is *direct and substantial* and the burden imposed is *proportional.*" Further, there was substantial evidence to support the district court's conclusion that TRPA regulations, past or present, did not "deprive[] Mr. Kelly of his interest in property in a manner requiring compensation." We, therefore, will not disturb the district court's determination on appeal. Trident Construction Corp. v. West Electric, Inc., 105 Nev. 423, 427, 776 P.2d 1239, 1241 (1989).

We have considered Kelly's other contentions and conclude that they also lack merit.

## THE TRPA'S CROSS-APPEAL

TRPA cross-appeals and argues that the district court erred when it determined that the federal district court's order granting Kelly "deemed approved" status[17] of Uppaway Estates exempted Kelly from compliance with the 1987 Plan IPES regulations. Specifically, TRPA argues that the district court erred in concluding that Kelly "does not have to obtain an allocation under Chapter 33 of TRPA ordinances for [the Hilltop] lots" and that there is "no legal impediment to Mr. Kelly preventing him from proceeding immediately to build or sell his seven (7) hilltop lots."

The underlying question for this court to decide on the "deemed approved" issue is whether, in light of the federal district court decision, Uppaway Estates could be subjected to subsequent regulations governing aspects of timing of construc-

---

[17]The federal district court order regarding the status of Kelly's Uppaway project stated the following in pertinent part:

> In the present case, the tentative map [including the variance for land coverage in excess of the maximum allowed for the property] for Uppaways [sic] Estates was approved by defendant agencies [Douglas County] and was submitted to TRPA for action. No action was taken within sixty days and it is *deemed approved.*

(Emphasis added.)

tion, such as the 1987 Plan's IPES system. The district court answered the question negatively. We disagree.

First, a brief review of the federal district court order is necessary. Judge Thompson held in his order that the tentative subdivision map for Uppaway Estates was "deemed approved" under Article VI(k) of the 1969 Compact. Judge Thompson found that Kelly's project was "deemed approved" as a matter of law because TRPA Governing Board had failed to attain a "dual-majority vote" for approval or denial under Article III(g). Judge Thompson relied on Younger v. Tahoe Reg. Planning Agency, 516 F.2d 215 (9th Cir. 1975), *cert. denied,* 423 U.S. 868 (1975), and observed that in light of *Younger,* TRPA board's vote on Kelly's project "constituted no action by TRPA and brought into operation the provisions of Article VI(k) of the [1969] Compact with the effect that the proposal was deemed approved."

When interpreting the meaning of "deemed approved," this court is cognizant of the policy implications of such a decision. TRPA implemented the IPES regulation scheme as a means to address equitably the pressing demand to develop thousands of single-family lots in a lake basin suffering rapidly diminishing environmental quality. IPES directs development to the areas most able to withstand it in an attempt to attain and maintain environmental threshold carrying capacities. Essentially, IPES determines "what" lots may be built on, "where" those lots may be located, "how" a developer may distribute land coverage, and most importantly, "when" those lots may be eligible for development. We conclude that a district court cannot ignore the environmental concerns of TRPA and cannot reject IPES out of hand. The Lake Tahoe Basin appears to be in an environmental tailspin which will eventually destroy it permanently unless preventative measures can be implemented and enforced immediately. Further, if Kelly is not required to follow the IPES regulatory scheme, that decision could cause irreparable harm to the Basin because all other landowners in Kelly's position, those whose permits were approved prior to the implementation of the IPES system, would be allowed to develop their land immediately. If this court allows this decision to stand, the development of less-than-ideal lots could precipitate the degradation of the water quality of Lake Tahoe and Lake Tahoe Basin's natural beauty.

In conclusion, the district court properly determined that Uppaway Estates, including its excess land coverage variance, was "deemed approved" via Judge Thompson's federal district court order. The district court, however, erred when it interpreted "deemed approved" status to mean that Kelly was exempt from Chapter 33 of TRPA Ordinances, that he was exempt from all non-routine requirements of the 1987 Plan and that Kelly could

commence building immediately. We conclude that the federal district court order that "deemed approved" Uppaway Estates as a matter of law only referred to "where" (plat map approval with all appropriate designations) and "how" (approval of the amount of land coverage for each parcel), not to "when" Kelly can commence building on his lots. Judge Thompson's order did not address "when" the lots could be developed, and we conclude that this question can only be answered in light of the 1980 Compact including the current IPES standards. We, therefore, affirm the "deemed approved" status of Uppaway Estates, but reverse the district court's conclusion that Kelly "does not have to obtain an allocation under Chapter 33 of TRPA ordinances for [the Hilltop] lots" and that there is "no legal impediment to Mr. Kelly preventing him from proceeding immediately to build or sell his seven (7) hilltop lots."

## CONCLUSION

With respect to appellant Kelly's appeal, we affirm the district court's judgment in all respects; and with respect to TRPA's cross-appeal, we reverse the trial court's judgment exempting Kelly from compliance with the 1987 Plan IPES regulations.[18]

---

[18]In February 1993, TRPA moved to strike Appendix B from Kelly's reply brief. Appendix B is the minutes of a September 22, 1992, TRPA Governing Board Meeting that demonstrate that TRPA had not lowered the IPES lot line since 1987. In turn, Kelly filed an opposition and motion for this court to take judicial notice of the contents of Appendix B. We grant TRPA's motion to strike Appendix B. Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 272 n.20, 830 P.2d 107, 121 n.20 (1992) ("[O]ur review is properly confined to the record made and considered . . . ."); see also In Re Marriage of Holder, 484 N.E.2d 485, 490 (Ill.App. 1985) (Appellate courts should not use judicial notice to expand scope of review where matters subject of judicial notice were "matters which were highly disputed at trial and not properly part of the record on appeal.")