McCARRAN INTERNATIONAL AIRPORT AND CLARK COUNTY, A POLITICAL SUBDIVISION OF THE STATE OF NEVADA, APPELLANTS, *v.* STEVE SISOLAK, RESPONDENT.

No. 41646

July 13, 2006                                                137 P.3d 1110

*David J. Roger*, District Attorney, and *E. Lee Thomson*, Deputy District Attorney, Clark County; *Jones Vargas* and *R. Douglas Kurdziel, Kirk B. Lenhard*, and *Scott M. Schoenwald*, Las Vegas, for Appellants.

*Law Offices of Laura Wightman FitzSimmons* and *Laura Wightman FitzSimmons*, Las Vegas, for Respondent.

*Law Offices of Thomas D. Beatty* and *Thomas D. Beatty*, Las Vegas; *Foley & Lardner* and *Christi R. Adams* and *John R. Hamilton*, Orlando, Florida, for Amicus Curiae Airports Council International.

*Lewis & Roca* and *Martha J. Ashcraft*, Las Vegas; *Community Rights Counsel* and *Timothy J. Dowling* and *Douglas T. Kendall*, Washington, D.C., for Amicus Curiae American Planning Association.

*Lionel Sawyer & Collins* and *E. Leif Reid*, Reno; *David A. Berg*, Washington, D.C.; *Beveridge & Diamond, P.C.*, and *Gus Bauman, Thomas Richihi*, and *Justin A. Savage*, Washington, D.C., for Amicus Curiae Air Transport Association of America, Inc.

*Woodburn & Wedge* and *John F. Murtha*, Reno, for Amicus Curiae Airport Authority of Washoe County.

## OPINION

By the Court, HARDESTY, J.:

In this appeal, we determine whether the district court properly concluded that a county height restriction ordinance effected a "per se" taking of the airspace above private land that is located within the departure critical area of an airport approach zone. Appellant Clark County operates McCarran International Airport, the primary commercial airport serving southern Nevada. The County adopted height restriction ordinances limiting the development of respondent Steve Sisolak's airspace. The district court concluded that the height restriction ordinances effectuated a per se taking, and a jury awarded Sisolak compensatory damages of $6.5 million. Thereafter, the district court awarded Sisolak attorney fees, costs and prejudgment interest. Because the height restriction ordinances authorize airplanes to make a permanent, physical invasion of the landowner's airspace, we conclude that a *Loretto*-type[2] regulatory per se taking occurred, requiring an award of just compensation. Accordingly, we affirm the district court's judgment.

---

[2]*See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).

## FACTS

### The property

Since 1955, the County has restricted the height of buildings on property in the vicinity of its public use airports. The County's height restriction ordinances are designed to avoid air navigation hazards that could endanger the lives and property of airport users and nearby property occupants.

During the 1980s, Sisolak bought three adjacent parcels of land for investment purposes, which were each zoned for the development of a hotel, a casino, or apartments.[3] Located on the southwest corner of South Las Vegas Boulevard and Arby Avenue in Las Vegas, the parcels lie 5,191 feet from the west end of a McCarran International Airport runway.

When Sisolak purchased the property, Clark County Ordinance 728 was in effect. Passed in order to regulate the height of structures and the use of property in the vicinity of all public use airports, the Ordinance aimed to prevent the establishment of obstructions that would pose air navigation hazards. According to Clark County's legislative findings, such obstructions could "reduce the size of the areas available for the landing, takeoff, and maneuvering of aircraft, thus tending to destroy or impair the utility and capacity of [public use airports] and the public investment therein."[4]

Under Ordinance 728, Sisolak's property was in a generalized area known as the "horizontal zone." The Ordinance restricted the height for development of property located in the horizontal zone to 150 feet above the established airport elevation. Because Sisolak's property was at a higher elevation than the established airport elevation, and due to the varying elevations on the property itself, Ordinance 728 actually imposed restrictions limiting the height of structures on his property to between 80 and 90 feet above ground level (AGL).

If a property owner desired to exceed the height restriction, Ordinance 728 required the owner to provide notice to the Federal Aviation Administration (FAA) and the Clark County Director of Aviation for a determination that the proposed building was situated or marked so as not to constitute an aircraft navigation hazard. Further, the ordinance required the property owner to apply for a variance with the Clark County Planning Commission. The Planning Commission could grant a variance when

---

[3]Sisolak purchased the first five-acre parcel in 1983. In 1986, he purchased an additional five acres, consisting of two smaller parcels.

[4]Clark County, Nev., Ordinance 728 (Feb. 3, 1981).

a literal application or enforcement of these regulations would result in practical difficulty or unnecessary hardship, and the relief granted would not be contrary to the public interest, but would do substantial justice and be in accordance with the spirit of these regulations and of Chapter 29.66 of the Clark County Code.

In 1990, McCarran Airport began expanding and upgrading the runway at issue for use by commercial jet aircraft, in conformity with the 1979 Clark County master plan. As a result, the county enacted two ordinances that further affected Sisolak's property.

First, the County adopted Ordinance 1221, amending Ordinance 728, in response to the changes in the runway's use. Ordinance 1221 placed Sisolak's property in the precision instrument runway approach zone, which subjected the property to a 50:1 slope restriction.[5] On Sisolak's property, this resulted in an actual height restriction between 41 and 51 feet. However, regardless of the height restrictions for a particular zone, nothing in the Ordinance could be construed as prohibiting the construction or maintenance of any structure to a height up to thirty-five feet above the surface of the land in any zone.

In order to proceed with a project, Ordinance 1221 required that a property owner notify the FAA of any proposed construction that would (1) exceed a height of 200 feet, (2) exceed "[t]he plane of an imaginary surface extending outward and upward at a slope of 100 to 1 for a horizontal distance of 20,000 feet from the nearest point of the nearest runway," or (3) be in an instrument approach area when available information would indicate that the height might exceed any FAA obstruction standard. Ordinance 1221 also provided that the Clark County Planning Commissioners held final authority to grant variances from the height restrictions.

Second, the County enacted Ordinance 1599, which adopted "Airspace Zoning Maps," including an Aircraft Departure Critical Area Map for McCarran Airport. According to the map, Sisolak's property was located in the departure critical area and was therefore placed under an 80:1 slope restriction (limiting an owner's use of airspace one foot above ground level for every 80 feet from the runway), resulting in height restrictions of 3 to 10 feet above ground level. Ordinance 1599 provided for a variance procedure similar to that in Ordinance 1221.

---

[5]Ordinance 1221 defined the runway approach zone as an airspace extending to a horizontal distance of fifty thousand feet from the runway, limiting an owner's use of airspace one foot above ground level for every 50 feet away from the runway for the first ten thousand feet and to a 40:1 slope restriction (one foot above ground level for every 40 feet away from the runway) for the remaining forty thousand feet.

In addition to the height restrictions created by the Ordinances, Sisolak's property was burdened by a perpetual avigation easement granted by Sisolak's predecessor in interest in response to a demand by the County in approving a development application.[6] The easement authorized aircraft flights over one half of the property[7] and provided that the County would have

> a perpetual right of flight, for the passage of aircraft in the air space above the surface of said premises, together with the right to cause in said air space such noise as may be inherent in the operation of aircraft, now known or hereafter used for navigation of or flight in the air, using said air space or landing at, or taking-off from or operating at, or on the premises known as McCarran International Airport.

The County has required these types of avigation easements since at least 1973 as a standard precondition for development approvals for property anywhere within the County.

*Development history*

Sisolak's property had always been vacant land. In 1991, Sisolak listed the property for sale. In the following years, he received multiple offers, ranging from $4,752,000 to $7,000,000. However, no sales were completed.

In 2000, one of the potential developers submitted proposed building plans to the FAA and the County for approval. The developer wanted to build "Forbidden City," a four-story, 600-room resort hotel and casino. The developer requested a variance from the height restrictions to build up to 70 feet.

During the negotiations, a realtor informed Sisolak of the height restrictions on his property. Following up on this information, Sisolak spoke with Bill Keller, a principal planner with the Clark County Department of Aviation. Sisolak testified that Keller explained the height restrictions on the property and told Sisolak about the variance process. Sisolak claimed that Keller told him not to bother asking for a variance to build to more than 75 feet because the County would not approve it. Keller testified that, while he did not have an independent recollection of a conversation with Sisolak, he normally informs a potential developer of the vari-

---

[6]An avigation easement is "a signed, acknowledged recognition of the right of overflight from any airport, including the right to make the noise necessary to operate the aircraft operating from such an airport." Clark County, Nev., Code § 30.08.030 (2005).

[7]Only the second five-acre parcel acquired by Sisolak was proposed for development by the predecessor in interest. Therefore, the easement encumbered only half of Sisolak's property.

ance procedure. Keller stated that any height estimates he would have given Sisolak would have been in response to hypothetical situations, not specific to Sisolak's property. The FAA granted the variance, in part, and approved building Forbidden City up to a height of 66 feet, concluding that such a building would not constitute an airport obstruction. The Planning Commission also approved the proposal. However, the approval lapsed because the developer failed to commence construction within the required one-year period. Sisolak did not complete the sale, and no other variance applications were submitted.

## Pretrial litigation

Shortly after the attempted sale, Sisolak filed a complaint against the County for inverse condemnation. Sisolak complained that the height restrictions constituted a per se taking of his property under the United States and Nevada Constitutions. Further, Sisolak alleged that low and frequent flights over his property from McCarran Airport devalued the property by subjecting it to noise, dust, and fumes and constituted a compensable taking. The County denied Sisolak's allegations.

Sisolak then filed a motion for summary judgment on the liability issue, in which he asserted that, under state and federal law, he had a property interest in the airspace up to 500 feet.[8] He argued that the County, by passing various ordinances, denied him the use of the airspace above the property by appropriating it for public use, which constituted a per se taking. Claiming that the occupancy of his airspace substantially decreased the value of his land, Sisolak demanded just compensation.

In support of his position, Sisolak submitted a video recording taken from the vacant land that showed planes flying over the property. Neither the airport nor Sisolak provided records showing the exact number of planes using the airspace or at what altitude the planes flew over Sisolak's property. Instead, Sisolak relied on estimates to assert that, on average, approximately 100 planes per day used his airspace at altitudes below 500 feet.

Opposing Sisolak's motion, the County filed a countermotion for summary judgment, arguing that Sisolak did not have a vested property interest in the airspace over his land. According to the County, Sisolak had failed to demonstrate a per se taking because he had not shown that the flights over his land were so low and so frequent as to deprive him of the existing use of the property.

---

[8]The airspace above 500 feet constitutes "navigable airspace," defined as "airspace above the minimum altitudes of flight prescribed by regulations . . . including airspace needed to ensure safety in the takeoff and landing of aircraft," and is considered to be in the public domain. 49 U.S.C. § 40102(a)(30) (2000).

Further, the County contended, the Ordinances did not require Sisolak to acquiesce to a physical invasion of the property and, in any case, Sisolak's claim was not ripe because he had never been denied a variance.

After a hearing, the district court denied Sisolak's motion, finding that genuine issues of material fact remained regarding whether Sisolak was injured by the County's use of the airspace. Although the district court agreed with Sisolak regarding the inverse condemnation law, it could not discern from the evidence whether the County unequivocally agreed that aircraft flew through Sisolak's airspace at altitudes lower than 500 feet. Subsequently, the district court indicated that the flights would constitute a per se taking if Sisolak showed that his property was subject to overflights at altitudes lower than 500 feet.

Approximately two months later, the parties provided three items of evidence regarding the flight of aircraft below 500 feet. First, the parties filed a portion of the deposition of a McCarran Airport employee, in which the employee testified that it was "more likely than not" that, on occasion, aircraft flew over Sisolak's property at altitudes lower than 500 feet, but that he was unable to specify the exact altitudes. Second, they supplied a map depicting flight tracks for McCarran Airport that indicated that a flight track went over Sisolak's property. Third, the parties presented the County's response to Sisolak's first set of interrogatories in which the County acknowledged that "[u]pon visual observation, defendants believe that aircraft have flown over the subject property at an altitude lower than 500 feet."

The district court found that the evidence established that airplanes were flying through Sisolak's airspace at an altitude lower than 500 feet. Accordingly, the district court held that Sisolak had established a prima facie case for a per se taking, relying on *Loretto v. Teleprompter Manhattan CATV Corp.*,[9] *Kaiser Aetna v. United States*,[10] and *Nollan v. California Coastal Commission.*[11]

Subsequently, the County filed a motion to amend the court's order or, in the alternative, to dismiss Sisolak's complaint. In its motion, the County argued that the order was inconsistent with the district court's prior orders and decisions, specifically, that the district court's previous decisions were premised on the use of the airspace above Sisolak's land and that the order granting summary judgment was based on the Ordinances.

Alternatively, the County argued that if the district court did not amend its order, it should dismiss Sisolak's complaint on ripeness

---

[9]458 U.S. 419 (1982).

[10]444 U.S. 164 (1979).

[11]483 U.S. 825 (1987).

grounds. Citing *Pennsylvania Coal Co. v. Mahon*,[12] the County argued that a regulatory takings case is only ripe for adjudication when the landowner exhausts all administrative remedies. According to the County, Sisolak had never applied for a variance; therefore, Sisolak's takings claim was not ripe for review. Sisolak opposed the motion, claiming that his argument had always been that the effect of the Ordinances was a physical invasion of his airspace, resulting in a per se takings claim and that, therefore, exhaustion of administrative remedies was not necessary. The district court denied the motion to amend.

## Trial

After the district court held that the Ordinances effected a per se taking of Sisolak's private property, the matter proceeded to trial for the determination of just compensation due. The parties stipulated to dismiss all claims raised in the complaint concerning noise, dust, fumes, fuel, particles and/or vibrations caused by or resulting from the operation of aircraft over Sisolak's property.

One of Sisolak's experts testified regarding devaluation of Sisolak's property caused by the Ordinances. This expert appraised the property for its highest and best use at $10,890,000, as of May 2001, taking into account Ordinance 728, but not Ordinances 1221 and 1599. According to this expert, the property's best use in the "before condition" would be a hotel or timeshare with a height of approximately 110-180 feet. To determine the extent of the taking, the expert subtracted the value in the "before condition" from the property's value in the "after condition," the highest and best use of the property after taking into account the height restrictions. Despite the fact that, if strictly enforced the Ordinances prevented Sisolak from building any structure exceeding 3 to 10 feet on his property, Sisolak only sought damages for the area above 66 feet, the extent of the variance previously granted by the County for the proposed Forbidden City project. As a result, the expert, working under the assumption that a developer could build to a height of 66 feet, calculated that Sisolak's property was worth $4,791,000 in the "after condition." Therefore, Sisolak's first expert concluded that the taking was worth $6,980,000.

Sisolak's second expert also concluded that the highest and best use of the property, without considering Ordinances 1221 and 1599, would be a hotel, casino or timeshare, since that was the trend in the surrounding area,[13] and that the property was worth

---

[12]260 U.S. 393 (1922).

[13]Across the street from Sisolak's property are two new three-story hotels. These properties do not fall within the critical departure zone. Thus, they are subject to less strict height restrictions than Sisolak's property.

$12,200,000 for these uses. After appraising Sisolak's property at $5,230,000 in the "after condition," with the assumption that Sisolak could build to 66 feet, this expert concluded that the taking resulted in a loss to Sisolak of $6,970,000.

The County's expert witness did not consider a smaller scale casino to be appropriate on the property, since it would mainly rely on local residents for support and the area surrounding Sisolak's property did not have the population density necessary for such a project. According to the County's expert, the highest and best use of the property would be a commercial development, four- to five-story timeshare or hotel, such as those recently built in the vicinity. This expert appraised Sisolak's property, in the "before condition," at $6,735,000.

With respect to the Ordinances' impact, the County expert stated that they did not negatively influence Sisolak's property. After the enactment of Ordinance 1221, according to this expert, property values in the area had continued to increase and property development had commenced. Taking into consideration that more regulated property is less desirable than property with fewer restrictions, the County's expert appraised Sisolak's property at $6,535,000 in the after condition, thus estimating a loss of $200,000.

Over the County's objection, the district court instructed the jury that it "must determine the fair market value of Mr. Sisolak's property after the imposition of Ordinances 1221 and 1599, under the condition that a variance would be granted to construct a building no higher than 66 feet above ground level." The jury then returned a verdict in Sisolak's favor for $6,500,000. Subsequently, the district court entered a judgment in inverse condemnation and awarded Sisolak a total of $16,617,730.68, reflecting the $6,500,000 jury award, $107,730.68 in costs, $1,950,000 in attorney fees, and $8,060,000 in interest.

The County appeals. The American Planning Association, Air Transport Association of America, Inc., Airports Council International-North America and the Airport Authority of Washoe County filed amicus curiae briefs in support of the County's position on appeal.

## DISCUSSION

We must determine whether Sisolak had a valid property interest in the airspace over his property; whether the height restrictions constituted a regulatory per se taking of the property, and whether the district court abused its discretion during trial and post-trial proceedings relating to the award of just compensation, attorney fees and costs, and prejudgment interest.

*Sisolak has a valid property interest in the airspace above his land*

An individual must have a property interest in order to support a takings claim.[14] Accordingly, the court must first determine "whether the plaintiff possesses a valid interest in the property affected by the governmental action, [that is,] whether the plaintiff possessed a 'stick in the bundle of property rights,'" before proceeding to determine whether the governmental action at issue constituted a taking.[15] The term "property" includes all rights inherent in ownership, including the right to possess, use, and enjoy the property.[16]

The County argues that the district court erred by finding that Sisolak has a vested property interest in the airspace above his property up to 500 feet. The County contends that neither federal nor state law recognizes a constitutionally protected property interest in the airspace above land. Further, the County argues that Sisolak had no interest in the airspace over one-half of the property based on the plain terms of the perpetual avigation easement conveyed to the County by his predecessor in interest. Accordingly, the County argues that no taking was possible as a matter of law. We disagree.

The Supreme Court of the United States has recognized, in its seminal case involving airspace takings, that a landowner has an interest in at least some of the airspace above his or her land.[17] In *United States v. Causby*, the Supreme Court reasoned that "[t]he landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material."[18]

After *Causby*, Congress redefined "navigable airspace" to mean "airspace above the minimum altitudes of flight prescribed by regulations . . . [including] airspace needed to ensure safety in takeoff and landing of aircraft."[19] Current regulations define "minimum safe altitudes" as heights of 1000 feet above the highest obstacle in congested areas or 500 feet over other than congested areas, except where necessary for takeoff or landing.[20]

---

[14]*Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1374 (Fed. Cir. 2000).

[15]*Id.*

[16]*Black's Law Dictionary* 1252 (8th ed. 2004).

[17]*United States v. Causby*, 328 U.S. 256, 264 (1946).

[18]*Id.* (citation omitted).

[19]49 U.S.C. § 40102(a)(30) (2000).

[20]14 C.F.R. § 91.119 (2006).

Therefore, the airspace above required minimum altitudes for flight, as established in federal regulations, is in the public domain, while the ownership of the airspace below such minimum altitudes is vested in the owner of the subjacent land, who is entitled to compensation for flights invading that airspace when taken by the government. The United States Supreme Court emphasized, in *Griggs v. Allegheny County*, that although airplanes may fly below 500 feet when necessary for takeoff and landing, this right does not divest the property owner of his protected property right to his usable airspace.[21] Rather, a landowner may still make a claim for compensation for the government's use of that airspace.[22]

This reasoning applies with equal force under Nevada law. Article 1, Section 1 of the Nevada Constitution states that acquiring, possessing and protecting property are inalienable rights. In this, it is clear that Nevadans' property rights are protected by our State Constitution. These property rights include at least the useable airspace of the subjacent land.[23] Although NRS 493.030 declares state government sovereignty in the airspace above the land in Nevada,[24] NRS 493.040 states that "[t]he ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight described in NRS 493.050." Thus, the landowners own the usable airspace above their property up to 500 feet, subject to intrusion by lawful air flight.

NRS 493.050(1)(a) states that air flight is lawful unless it interferes with the "then existing use to which the land or water, or the space over the land or water, is put by the owner." Based on the plain language of the statute, "then existing use" refers to the condition of the property when flights occur and is not intended to create a limitation or restriction on the development or use of land. Nor does the statute prohibit landowners from occupying or using

---

[21]369 U.S. 84, 88-89 (1962); *id.* at 90 ("Without the 'approach areas,' an airport is indeed not operable. Respondent in designing it had to acquire some private property. Our conclusion is that by constitutional standards it did not acquire enough.").

[22]*Ray S. Matson, et al.*, 145 Ct. Cl. 225 (1959).

[23]We note that at the time our Constitution was adopted in 1864, only the fixed-wing glider was in existence, and it is doubtful our framers were concerned about the use of airspace at the time. The first successful controlled powered flight by the Wright Brothers occurred in 1903.

[24]NRS 493.030 states:

Sovereignty in the space above the lands and waters of this state is declared to rest in the State, except where granted to and assumed by the United States pursuant to a constitutional grant from the people of the State.

"Sovereignty" is defined, in part, as "[s]upreme dominion, authority, or rule," or "[t]he supreme political authority of an independent state." *Black's Law Dictionary* 1430 (8th ed. 2004).

their airspace up to 500 feet. To conclude otherwise would require this court to find an unspecified height restriction on all undeveloped property in Nevada. We reject that suggestion.

The statutory construction, consistent with the assurances found in our Constitution, makes the lawful right to flight subordinate to the ownership of the space above the lands. Therefore, airplanes may fly over Sisolak's property below 500 feet so long as they do not interfere with his current or future use of the property. While NRS 493.030, NRS 493.040, and NRS 493.050(1)(a) recognize lawful air flight over private property, those statutes ensure the landowners' ownership and use of their airspace up to 500 feet. It is for that reason that NRS 37.010(14) recognizes that eminent domain may be exercised for "[a]irports, facilities for air navigation and aerial rights-of-way." Thus, we conclude that Nevadans hold a property right in the useable airspace[25] above their property up to 500 feet.[26]

Further, the perpetual avigation easement conveyed to the County by Sisolak's predecessor in interest did not abrogate Sisolak's property interest in the airspace or serve as a defense to the inverse condemnation claim. We have reasoned that

> "an easement obtained by a government entity for a public use is only as broad as necessary for the accomplishment of the public purpose for which the easement was obtained and, to the extent the easement holder exceeds this right, it will be regarded as a trespasser and is responsible for damages."[27]

The easement in this case does not contain any height restriction terms but is simply an overflight easement exacted by the County to preclude liability for aircraft noise. To interpret the County's easement as permitting the use of all of Sisolak's airspace for overflights is overly broad and not narrowly crafted to accomplish the reasonable government purpose of providing flights access to

---

[25]Like most property rights, the use of the airspace and subjacent land may be the subject of valid zoning and related regulations which do not give rise to a takings claim. At issue in this case is the permanent physical invasion of airspace and the resulting exclusion of the landowner therefrom caused by the Ordinances.

[26]The County argues that Sisolak never obtained a vested property right in his airspace because he failed to obtain zoning or use permit approvals to undertake a project to use the airspace, and thus his airspace was not constitutionally protected from uncompensated takings. This argument lacks merit because NRS 493.040 vests ownership in the space above land, up to 500 feet, in the owners of that property.

[27]*S.O.C., Inc. v. The Mirage Casino-Hotel*, 117 Nev. 403, 409, 23 P.3d 243, 247 (2001) (quoting *Dixon v. City of Phoenix*, 845 P.2d 1107, 1114 (Ariz. Ct. App. 1992)).

and from McCarran Airport. Thus, it cannot be read to unconditionally transfer the airspace rights above Sisolak's property to the County.

Although similar avigation easements are recorded against property throughout Clark County as a condition of building permits, requiring an uncompensated easement as a condition to development is improper and cannot be used by the County as a defense to the taking of a landowner's airspace without compensation. The Supreme Court, in *Nollan v. California Coastal Commission*, reasoned that "to obtain easements of access across private property the State must proceed through its eminent domain power"[28] because "requiring uncompensated conveyance of [an] easement outright would violate the Fourteenth Amendment."[29] Therefore, the district court did not err in instructing the jury that the perpetual avigation easement provided no defense to the taking of Sisolak's airspace.

Although we conclude that Sisolak has a property interest in the useable airspace above his property up to 500 feet and that the district court correctly instructed the jury regarding the avigation easement, we must still consider whether the district court applied the correct legal analysis in granting summary judgment on the issue of liability.

*The district court did not err when it found the County liable for a Loretto-type per se regulatory taking of Sisolak's property*[30]

Whether the government has inversely condemned private property is a question of law that we review de novo.[31] We conclude that under both the United States and Nevada Constitutions, the facts of this case present a regulatory per se taking and that Sisolak is due just compensation for the government's physical invasion of his property.

The Takings Clause of the Fifth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment,[32] prohibits the government from taking private prop-

---

[28]483 U.S. 825, 832 (1987).

[29]*Id.* at 834.

[30]The district court characterized the taking as a physical taking. As clarified by *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005), and discussed in this opinion, the district court actually described a physical regulatory per se taking.

[31]*See City of Austin v. Travis County Landfill*, 73 S.W.3d 234, 241 (Tex. 2002); *S.O.C., Inc.*, 117 Nev. at 407, 23 P.3d at 246.

[32]*Chicago, Burlington &c. R'd v. Chicago*, 166 U.S. 226 (1897).

erty for public use without just compensation.[33] Article 1, Section 8(6) of the Nevada Constitution states "[p]rivate property shall not be taken for public use without just compensation having been first made, or secured."

Before 1922, "it was generally thought that the Takings Clause reached only a 'direct appropriation' of property, or the functional equivalent of a 'practical ouster of [the owner's] possession.'"[34] However, beginning with *Pennsylvania Coal Co. v. Mahon*, the United States Supreme Court determined that state regulation of property may also require just compensation, observing that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."[35] Thus, the Court developed "regulatory takings" jurisprudence under the Fifth and Fourteenth Amendments of the United States Constitution.[36] "[T]he Court recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment."[37]

Further, the Supreme Court defined "two categories of regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes."[38] Categorical rules apply when a government regulation either (1) requires an owner to suffer a permanent physical invasion of her property or (2) completely deprives an owner of all economical beneficial use of her property.[39] In determining whether a property owner has suffered a per se taking by physical invasion, a court must determine whether the regulation has granted the government physical possession of the property or whether it merely forbids certain private uses of the space.[40] If the regulation forces the property owner to acquiesce to a permanent physical occupation, compensation is automatically warranted,

---

[33]U.S. Const. amend. V.

[34]*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) (quoting *Legal Tender Cases*, 12 Wall. 457, 551 (1871) and *Transportation Co. v. Chicago*, 99 U.S. 635, 642 (1879)).

[35]260 U.S. 393, 415 (1922).

[36]*Lucas*, 505 U.S. at 1015.

[37]*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).

[38]*Id.* at 538.

[39]*Id.* We also recognized these categorical rules in *Kelly v. TRPA*, 109 Nev. 638, 648, 855 P.2d 1027, 1033 (1993).

[40]*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322-23 (2002); *Yee v. Escondido*, 503 U.S. 519, 522-23 (1992).

since this constitutes a per se taking. ''This element of required acquiescence is at the heart of the concept of occupation.''[41] The second type of per se taking, complete deprivation of value, is not at issue in this case because Sisolak never argued that the Ordinances completely deprived him of all beneficial use of his property.

''Outside these two relatively narrow categories . . . regulatory takings challenges are governed by the standards set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).''[42] While the Supreme Court has not provided a ''set formula to determine where regulation ends and taking begins,''[43] it prefers to ''engag[e] in . . . essentially ad hoc, factual inquiries'' and established three guideposts in *Penn Central* to examine whether a regulation that does not constitute a physical invasion and does not deprive the owner of all viable economic use nevertheless effects a compensable regulatory taking.[44] A court should consider (1) the regulation's economic impact on the property owner, (2) the regulation's interference with investment-backed expectations, and (3) the character of the government action.[45] In examining whether a regulatory taking has occurred, a reviewing court must consider the property as a whole.[46] Additionally, an allegation that a regulation has diminished the property's value, or destroyed the potential for its highest and best use, does not, without more, constitute a taking.[47] A *Penn Central*-type regulatory

---

[41]*FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987).

[42]*Lingle*, 544 U.S. at 538; *see also Kelly*, 109 Nev. at 648, 855 P.2d at 1033.

[43]*Goldblatt v. Hempstead*, 369 U.S. 590, 594 (1962).

[44]438 U.S. 104, 124 (1978).

[45]*Id.*

[46]*Id.* at 130-31 ('' 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, [the] Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . .''); *see also Tahoe-Sierra*, 535 U.S. at 331 (district court erred by disaggregating property into a thirty-two month segment of time from the remainder of the property owner's fee simple estate and considering whether property owners were deprived of all economically viable use during that period).

[47]*See Euclid v. Ambler Co.*, 272 U.S. 365, 397 (1926) (regulations valid although they effected a seventy-five percent diminution in value of property); *Hadacheck v. Los Angeles*, 239 U.S. 394, 414 (1915) (ordinance prohibiting highest and best use of land as a brickworks was valid, although it reduced the value of property from $800,000 to $60,000); *William C. Haas v. City & Cty. of San Francisco*, 605 F.2d 1117, 1121 (9th Cir. 1979) (zoning regulations

taking requires compensation only if "the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole."[48]

*The matter is ripe for review under the regulatory per se takings analysis*

As a preliminary matter, we address the County's contention that this matter is not ripe for review because the County never denied a variance. The Supreme Court has required exhaustion of administrative remedies in cases where a regulation is alleged to have gone too far in burdening private property, " '[insisting] on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it.' "[49] However, the Supreme Court has reasoned that if a regulation effects an "unconditional and permanent" taking, the matter is ripe for the Court's review.[50] Further, in cases involving a physical occupation of private property, the government "has a categorical duty to compensate the former owner,"[51] and the extent of the occupation is relevant only to determine the amount of compensation due, not whether the regulation effects a taking.[52] Thus, Sisolak was not required to exhaust administrative remedies by applying for a variance before bringing his inverse condemnation action based on a regulatory per se taking of his private property.

*Sisolak did not have to prove low and frequent overflights to establish a regulatory per se taking*

With respect to takings cases involving overflights, the Supreme Court has held that when low and frequent airplane overflights substantially devalue the current use and enjoyment of property, a

---

were not a taking although they reduced the value of property from $2,000,000 to $100,000).

[48]*Yee v. Escondido*, 503 U.S. 519, 522-23 (1992).

[49]*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1011 (1992) (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 351 (1986)).

[50]*Id.* at 1012 (also reasoning that the landowner did not have to pursue any subsequently created permit procedures before his takings claim would be considered ripe).

[51]*Tahoe-Sierra*, 535 U.S. at 322.

[52]*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 437 (1982).

compensable event occurs. In *United States v. Causby*, low and frequent overflights by military aircraft destroyed a chicken farming business because the noise from the overflights caused the chickens to reduce egg production and to die from fright.[53] The Supreme Court noted that, if the flights rendered the farmer's land uninhabitable, it would be as if the government "had entered upon the surface of the land and taken exclusive possession of it."[54] Because the limitation on the land's utility profoundly diminished its value, the Court held that "[f]lights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land."[55]

Further, in *Griggs v. Allegheny County*, the Supreme Court considered whether a county-operated airport took an easement over a house through noise and air pollution from frequent and low overflights.[56] The Court noted that "use of land presupposes the use of some of the airspace above it . . . . An invasion of the 'superadjacent airspace' will often 'affect the use of the surface of the land itself.' "[57] Based upon evidence that the homeowners had abandoned their residence because they became "nervous and distraught" from extreme noise generated by airplane overflights,[58] the Court held that the owners were due just compensation.[59]

In *Causby* and *Griggs*, landowners presented evidence of low and frequent overflights, which diminished the value of the existing use of their property. Thus, some courts have interpreted *Causby* and *Griggs* to require that a prima facie case for inverse condemnation based upon a physical taking include evidence of low and frequent overflights causing a direct and immediate interference with the enjoyment and use of the land.[60] However, *Causby* and *Griggs* did not concern the regulation of property through airport height restriction ordinances, but rather the resultant nuisance from overflights on subjacent land. Therefore, because this case does involve ordinances affecting use of property, we conclude that a regulatory per se taking occurred without resorting to the low and frequent overflight analysis. Further, Sisolak's evidence that airplanes fly lower than 500 feet above his property was sufficient proof of a permanent physical invasion of his airspace.

[53]328 U.S. 256, 259 (1946).

[54]*Id.* at 261.

[55]*Id.* at 266.

[56]369 U.S. 84, 85 (1962).

[57]*Id.* at 89 (citation omitted) (quoting *Causby*, 328 U.S. at 265).

[58]*Id.* at 87.

[59]*Id.* at 90.

[60]*See Brown v. U.S.*, 73 F.3d 1100, 1104 (Fed. Cir. 1996); *Village of Willoughby Hills v. Corrigan*, 278 N.E.2d 658, 664 (Ohio 1972).

*The ordinances effect a regulatory per se taking of Sisolak's property under the United States and Nevada Constitutions*

We agree with Sisolak that, under the United States and Nevada Constitutions, the ordinances authorize the permanent physical invasion of his airspace. The ordinances exclude the owners from using their property and, instead, allow aircraft to exclusively use the airspace as a critical departure area within an airport approach zone. The essential purpose of the ordinances adopted to facilitate flights through private property is to compel landowner acquiescence.

In contrast to *Penn Central*-type regulatory takings cases, regulatory per se takings cases "are relatively rare, easily identified, and usually represent a greater affront to individual property rights."[61] Before its seminal physical occupation takings case, *Loretto v. Teleprompter Manhattan CATV Corp.*,[62] the Supreme Court determined that the United States Government took private property when it attempted to create a public right of access to a pond that, until substantial improvements by its private landowners, was incapable of being used as a navigable waterway.[63] In that case, *Kaiser Aetna v. United States*, the Court distinguished a taking "in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of . . . private property," from a physical invasion of private property.[64] And the Court concluded that "the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina."[65] The Court further concluded that "even if the Government physically invades only an easement in property, it must nonetheless pay just compensation."[66]

The Supreme Court clarified its regulatory per se takings analysis in *Loretto* when it considered "whether a minor but permanent physical occupation of an owner's property authorized by government constitutes a 'taking' of property for which just compensation is due."[67] In *Loretto*, a New York statute required landlords to permit a cable television company to install cables and junction boxes

[61]*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 324 (2002).

[62]458 U.S. 419 (1982).

[63]*Kaiser Aetna v. United States*, 444 U.S. 164, 178 (1979).

[64]*Id.* at 180.

[65]*Id.*

[66]*Id.*

[67]458 U.S. at 421.

in their buildings.[68] The Supreme Court held that the New York statute authorized a permanent physical occupation of the landowners' property that required compensation.[69] Although it reasoned that *Kaiser Aetna* was not a per se taking case because the easement of passage was not a permanent occupation of land, the case nevertheless "reemphasize[d] that a physical invasion is a government intrusion of an unusually serious character."[70]

Here, the district court found that the presence of aircraft over Sisolak's property at altitudes below 500 feet, as permitted by the Ordinances, constituted a permanent physical invasion of his property and was sufficient to establish a taking.[71] We agree. The district court properly concluded that Ordinances 1221 and 1599 permit airplanes to permanently invade Sisolak's property and appropriate it for public use without just compensation.

We disagree with the County's argument that the Ordinances do not require Sisolak to submit to the government's or public's use of his property since the Ordinances do not direct the flight of aircraft in any way and do not directly authorize the physical invasion of Sisolak's airspace. Although the airplanes flying over Sisolak's property are not constantly occupying the airspace in a temporal sense, the invasion is nevertheless permanent because the right to fly through the airspace is preserved by the Ordinances and expected to continue into the future. The Ordinances grant airplanes permanent permission to traverse Sisolak's airspace, and Sisolak established that airplanes fly over his property at altitudes below 500 feet. The County is using Sisolak's airspace as and when it chooses and intends to do so indefinitely. Therefore, the Ordinances authorize a physical invasion of Sisolak's property and require Sisolak to acquiesce to a permanent physical invasion. As a result, the County has appropriated private property for public use without compensating Sisolak and has effectuated a *Loretto*-type per se regulatory taking.

Although predating the Supreme Court's decision in *Loretto*, several state supreme courts have concluded that height restriction ordinances, almost identical to the County's, resulted in unconsti-

---

[68]*Id.* at 423.

[69]*Id.* at 441.

[70]*Id.* at 433.

[71]The district court relied on *Kaiser Aetna, Loretto,* and *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), to conclude that the ordinances effected a per se taking of Sisolak's airspace. However, as clarified by the Supreme Court in *Lingle*, *Nollan* is more appropriately deemed a land exaction case, rather than a per se taking case. However, the district court's reliance on *Nollan* is understandable because of the *Nollan* Court's discussion of physical invasions in the context of an easement. The district court's reference to *Nollan* does not alter our conclusion that the height restriction Ordinances resulted in a *Loretto*-type physical invasion taking.

tutional takings of property for public uses.[72] The New Jersey Supreme Court has considered the constitutionality of an airport zoning ordinance that restricted the height of structures within approach and turning zones.[73] The court held the ordinance unconstitutional as a taking of private property for public use, stating that "[t]he City may not under the guise of an ordinance acquire rights in private property which it may only acquire by purchase or by the exercise of its power of eminent domain."[74]

Likewise, the Indiana Supreme Court has held that a zoning ordinance restricting the height of buildings within a specified distance of an airport, without providing for payment of compensation, unconstitutionally appropriated the property rights of the landowner in the airspace above the land.[75] The court stated that "mere regulation under the police power which can be modified at the discretion of regulating authority is wholly different from the taking or appropriating of private property by the government for a specific public use."[76]

Relying on these two cases, the Idaho Supreme Court has also concluded that the provisions of a city ordinance restricting the height of structures on the plaintiff landowner's property and limiting the use of the land constituted a taking of private property for public use, for which the city had to pay just compensation.[77]

The fact that the County enacted the Ordinances to ensure the safety of those arriving at or departing from McCarran Airport does not change the conclusion that a regulatory per se taking occurred. As the Supreme Court reasoned in *Griggs*, " 'an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed.' "[78] However, in designing the airport, a local government has to acquire enough private property in order to avoid a future taking of adjacent private property for public use without just compensation.[79] Accordingly, we conclude that under federal law the Ordinances effectuated a *Loretto*-type regulatory per se taking of Sisolak's property, entitling Sisolak to just compensation.

---

[72]*See Roark v. City of Caldwell*, 394 P.2d 641, 646-47 (Idaho 1964); *Indiana Toll Road Commission v. Jankovich*, 193 N.E.2d 237, 242 (Ind. 1963); *Yara Engineering Corporation v. City of Newark*, 40 A.2d 559 (N.J. 1945).

[73]*Yara Engineering Corp.*, 40 A.2d at 560.

[74]*Id.* at 561.

[75]*Jankovich*, 193 N.E.2d at 242.

[76]*Id.* at 241.

[77]*Roark*, 394 P.2d at 646-47.

[78]369 U.S. 84, 90 (1962) (quoting *Ackerman v. Port of Seattle*, 348 P.2d 664, 671 (Wash. 1960)).

[79]*Id.*

Our dissenting colleagues conclude that a *Penn Central*-type regulatory taking has occurred as a result of the height restrictions imposed by the County Ordinances. This conclusion is not unreasonable, given the difficulty in applying the federal takings jurisprudence. We, therefore, take this opportunity to clarify what constitutes a regulatory per se taking under our State Constitution.[80] When it comes to interpreting a state constitution, we have recognized that "states may expand the individual rights of their citizens under state law beyond those provided under the Federal Constitution."[81] Similarly, the United States Supreme Court has emphasized that a state may place stricter standards on its exercise of the takings power through its state constitution or state eminent domain statutes.[82]

The first right established in the Nevada Constitution's declaration of rights is the protection of a landowner's inalienable rights to acquire, possess and protect private property.[83] There is no corollary provision in the United States Constitution. Article 1, Section 8(6) of the Nevada Constitution requires the government to make or secure just compensation before taking private property. Early in our state's history, this court recognized that "[t]he property of a citizen can only be taken by an act of the legislature for a public use, when a necessity exists therefor, and when compensation to the owner has first been made or secured."[84] The constitutional requirement that the government must first make or secure just compensation before taking private property "is a personal [right] for the benefit of the property owner and subject to being waived by him."[85] The rights of property owners are "constitutionally satisfied when they receive just compensation for their properties."[86]

---

[80]Contrary to the suggestion by one of our dissenting colleagues that the parties did not litigate whether there was a taking under our State Constitution, the matter was raised in the proceedings below and in supplemental briefs before this court that include extensive discussion of the Nevada constitutional debates.

[81]*State v. Bayard*, 119 Nev. 241, 246, 71 P.3d 498, 502 (2003).

[82]*Kelo v. New London*, 545 U.S. 469, 489 (2005) ("We emphasize that nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power. Indeed, many States already impose 'public use' requirements that are stricter than the federal baseline.").

[83]Nev. Const. art. 1, § 1.

[84]*Dayton Mining Co. v. Seawell*, 11 Nev. 394, 399 (1876).

[85]*Saunders v. State*, 70 Nev. 480, 485, 273 P.2d 970, 972 (1954).

[86]*Urban Renewal Agcy. v. Iacometti*, 79 Nev. 113, 127, 379 P.2d 466, 473 (1963).

In this, the Nevada Constitution contemplates expansive property rights in the context of takings claims through eminent domain. The drafters of our Constitution imposed a requirement that just compensation be secured prior to a taking, and our State enjoys a rich history of protecting private property owners against government takings. To clarify regulatory takings jurisprudence under the Nevada Constitution, a per se regulatory taking occurs when a public agency seeking to acquire property for a public use enumerated in NRS 37.010, fails to follow the procedures set forth in NRS Chapter 37, Nevada's statutory provision on eminent domain, and appropriates or permanently invades private property for public use without first paying just compensation.[87] Thus, the adoption of ordinances that established a permanent physical invasion of the airspace above Sisolak's property, thereby appropriating the airspace for the County's use, effectuated a per se taking of his property under the Nevada Constitution.[88]

*The district court did not abuse its discretion during its trial and post-trial proceedings*

Because the district court did not err in holding the County liable for a per se taking of Sisolak's airspace, Sisolak was entitled

---

[87]See also NRS 497.270(1), stating that in cases where

(b) The approach protection necessary cannot, because of constitutional limitations, be provided by airport zoning regulations under this chapter; or

(c) It appears advisable that the necessary approach protection be provided by acquisition of property rights rather than by airport zoning regulations,

the political subdivision within which the property or nonconforming use is located, or the political subdivision owning the airport or served by it may acquire, by purchase, grant or condemnation in the manner provided by the law under which political subdivisions are authorized to acquire property for public purposes, such air right, avigation easement or other estate or interest in the property or nonconforming structure or use in question as may be necessary to effectuate the purposes of this chapter.

[88]We reject the County's contention that the government cannot afford to regulate by purchase in matters concerning public safety. First, the County is in a position to trade public property for other suitable property needed for airport operations. Second, the record indicates that only a limited number of property owners are affected by the most onerous restrictions in Ordinances 1221 and 1599, while the remaining property is already owned by McCarran Airport or the University of Nevada, Las Vegas. Further, a McCarran Airport representative acknowledged that it is ultimately the airlines that would pay a judgment in an eminent domain proceeding, not the taxpayers, and any judgments against the County will not likely materially affect its financial condition. Finally, any financial burden that the County must bear as a result of having to pay just compensation is irrelevant to the inquiry under the United States

to just compensation.[89] We conclude that the district court did not abuse its discretion during its trial and post-trial proceedings on just compensation, attorney fees, costs, and interest. First, the district court properly instructed the jury regarding the maximum allowable building height on the property. Second, the district court had a valid basis for its award of attorney fees and costs. Finally, the district court did not abuse its discretion by awarding pre-judgment interest. Accordingly, we affirm the district court's award of compensation, attorney fees and costs, and prejudgment interest.

*The district court did not abuse its discretion by instructing the jury that 66 feet was the maximum allowable building height on the property*

The County contends that the district court caused an inflated compensation award by erroneously instructing the jury that 66 feet was the maximum allowable building height on the property. Specifically, the County argues that the district court should not have negated the trial testimony of their obstruction and hazard expert, which implied that Sisolak could obtain a variance of more than 66 feet.[90] We conclude that, because the County's expert based his opinion on FAA regulations rather than the height restrictions imposed by the Ordinances, the district court did not abuse its discretion by excluding the expert's testimony from the jury's consideration.

"Constitutional principles provide that just compensation is measured by the fair market value of the condemned property."[91] "[T]he market value of the property should be determined by reference to the highest and best use for which the land is available and for which it is plainly adaptable."[92] However, the highest and

---

and Nevada Constitutions as to whether the regulations effected a per se taking of private property.

[89]*See Clark County v. Sun State Properties*, 119 Nev. 329, 335, 72 P.3d 954, 958 (2003) (stating that state and federal constitutional law requires the payment of just compensation to the property owner).

[90]The County's expert testified that at the property's four corners, the maximum building height that would not create an aviation hazard, when applying the most restrictive criteria used by the FAA, was 102 feet at the northwest corner, 115 feet at the southwest corner, 127 feet at the northeast corner, and 196 feet at the southeast corner.

[91]*Sun State Properties*, 119 Nev. at 335, 72 P.3d at 958.

[92]*County of Clark v. Alper*, 100 Nev. 382, 386-87, 685 P.2d 943, 946 (1984).

best use must be ''reasonably probable.''[93] In determining fair market value, the trier of fact may consider ''any elements that fairly enter into the question of value which a reasonable business-man would consider when purchasing.''[94]

Although evidence regarding variance procedures is irrelevant to establish whether a property owner is entitled to compensation for a regulatory per se taking, such evidence is still relevant in calculating the amount of compensation due.[95] Evidence of future changes affecting the property, such as variances or zoning ordinances, is admissible to determine the amount of compensation due if the change is reasonably probable. For example, in *City of Las Vegas v. Bustos*, the district court determined that, given the changes in the neighborhood and surrounding properties, it was reasonably likely that a prospective buyer of the property in question could obtain a zoning change from residential to commercial.[96] Additionally, we concluded that ''[t]he trier of fact may consider the effect of future rezoning or variances on the highest and best use of the condemned property when determining its value.''[97] We noted that there was ''undisputed evidence'' that the city had converted most of the land surrounding the property, zoned residential, to commercial use.[98] As a result, we concluded that the district court properly relied on that evidence in making its award of compensation.

Here, the County's expert testimony regarding maximum building heights under FAA regulations was irrelevant because the County Ordinances imposed more stringent height restrictions on Sisolak's property. Therefore, the jury did not have to consider whether the County would approve a variance application from Sisolak for more than 66 feet in determining just compensation for the taking. The district court properly based the jury instruction on valuation testimony given by both the County's and Sisolak's appraisers, who calculated the difference in value to the property by

---

[93]*City of Las Vegas v. Bustos*, 119 Nev. 360, 362, 75 P.3d 351, 352 (2003).

[94]*State ex rel. Dep't Hwys. v. Linnecke*, 86 Nev. 257, 261-62, 468 P.2d 8, 10-11 (1970), *quoted in Sun State Properties*, 119 Nev. at 335, 72 P.3d at 958.

[95]*Tahoe-Sierra*, 535 U.S. at 322 (''When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.'' (citations omitted)).

[96]119 Nev. at 361-62, 75 P.3d at 351-52.

[97]*Id.* at 362, 75 P.3d at 352.

[98]*Id.* at 363, 75 P.3d at 353.

relying on the previously granted variance of 66 feet. Accordingly, we affirm the award of damages.

> *The district court did not abuse its discretion by awarding attorney fees and costs*

We have established that a landowner has no constitutional right to recover attorney fees as a part of the just compensation for land taken by eminent domain.[99] Neither does NRS Chapter 37, Nevada's eminent domain statute, provide for attorney fees except upon abandonment of the action by the condemnor.[100] Although we will not disturb a district court's award of attorney fees and costs absent an abuse of discretion, the award must be authorized "by a statute, rule or contract."[101] We conclude that the district court properly based its award of attorney fees on a relevant provision of the Uniform Relocation Assistance and Real Property Acquisition Policies Act (Relocation Act).[102]

The Relocation Act requires that a state government entity receiving federal funds institute formal condemnation proceedings to acquire any interest in real property by exercising the power of eminent domain.[103] Further, the Relocation Act states that the court "shall" award "reasonable attorney, appraisal, and engineering fees, actually incurred because of the condemnation proceedings" only when "the final judgment is that the . . . agency cannot acquire the real property by condemnation; or . . . the proceeding is abandoned."[104] However, plaintiffs may recover attorney fees and costs if they succeed in an inverse condemnation claim against the government.[105] As one federal court has recognized, "[i]t is inevitable that the successful plaintiff in the . . . inverse condemnation action will be forced to pay greater litigation expenses than would have been necessary if the [state or] federal agency had properly performed its function and condemned the property in

---

[99]*Lamar v. Urban Renewal Agency*, 84 Nev. 580, 581, 445 P.2d 869, 870 (1968).

[100]*Id.*

[101]*U.S. Design & Constr. v. I.B.E.W. Local 357*, 118 Nev. 458, 462, 50 P.3d 170, 173 (2002).

[102]42 U.S.C. §§ 4601-4655 (2000).

[103]*See id.* § 4651(8) ("No [recipient airport] shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property.").

[104]*Id.* § 4654(a).

[105]*Id.* § 4654(c).

question.''[106] Therefore, this provision is an attempt by Congress ''to rectify this situation . . . by allowing recovery of litigation expenses for a successful plaintiff in an inverse condemnation action.''[107]

The provisions of the Relocation Act apply to all Nevada political subdivisions and agencies.[108] In particular, NRS 342.105(1) provides that

> [a]ny department, agency, instrumentality or political subdivision of this State, . . . which is subject to the provisions of the federal [Relocation Act], and the regulations adopted pursuant thereto, and which undertakes *any project that results in the acquisition of real property* or in a person being displaced from his home, business or farm, shall provide relocation assistance and make relocation payments to each displaced person and perform such other acts and follow such procedures and practices as are necessary to comply with those federal requirements.

(Emphasis added.)

The provisions of NRS Chapter 342 apply when ''the public body administering the programs or projects [is] funded in whole or in part by the federal government.''[109] In *County of Clark v. Alper*, we reversed the award of attorney fees to the owner of property taken by the county to widen a public street because the owner failed to show that the county received federal financial assistance to pay for all or any part of the project.[110]

We disagree with the County's argument that, in order for the Relocation Act to apply, there must be a specific nexus between the federal funding and the taking at issue as well as landowner displacement. Here, the Relocation Act entitles Sisolak to an award of attorney fees because the County received federal funding for numerous improvements at McCarran Airport, including runway reconstruction and land acquisition. The County was eligible to receive the federal funding specifically because it made assurances that it took steps, by enacting the Ordinances, to protect the airspace needed for aerial approaches to the airport and to prevent future construction into that airspace.[111]

---

[106]*Pete v. United States*, 569 F.2d 565, 568 (Ct. Cl. 1978).

[107]*Id.*

[108]NRS 342.105(1).

[109]*County of Clark v. Alper*, 100 Nev. 382, 396, 685 P.2d 943, 952 (1984).

[110]*Id.*

[111]*See* 49 U.S.C. § 47107(a)(10) (2000) (stating that the approval of a project grant application is conditioned on assurances regarding airport operations including assurances that ''appropriate action, including the adoption of zon-

Further, the Relocation Act does not limit eligibility for attorney fees to persons who have actually been displaced and who require relocation assistance. Because Sisolak is a property owner who was successful in his inverse condemnation action, the plain terms of the Relocation Act allowed the district court to award reasonable attorney fees and costs. Therefore, we conclude that the district court did not abuse its discretion by awarding Sisolak attorney fees and costs.

*The district court did not abuse its discretion by awarding pre-judgment interest*

The district court followed our decision in *Alper* when it awarded prejudgment interest from the date the County passed Ordinance 1221 until the district court entered its judgment in the case. In *Alper*, we reasoned that "[w]here the market value of the property is not paid contemporaneously with the taking, the owner is entitled to interest for the delay in payment from the date of the taking until the date of the payment."[112] An award of prejudgment interest "compensate[s] the landowner for the delay in the monetary payment that occurred after the property had been taken."[113] We conclude that the district court did not abuse its discretion by awarding prejudgment interest.

## CONCLUSION

The district court correctly concluded that the presence of aircraft over Sisolak's property at altitudes lower than 500 feet AGL, as permitted by the Ordinances, constituted a physical invasion of his private property. Sisolak suffered a *Loretto*-type regulatory per se taking under both the United States and Nevada Constitutions because Ordinances 1221 and 1599 appropriated his private property for a public use without the payment of just compensation. The Ordinances deny Sisolak his right to exclude others from his private property and instead require that Sisolak acquiesce to a permanent physical invasion of his property. Finally, the *Penn Central*-type takings analysis does not govern this action. Accordingly, we order the judgment of the district court affirmed.

GIBBONS, DOUGLAS, PARRAGUIRRE, JJ., and AGOSTI, Sr. J., concur.

---

ing laws, has been or will be taken to the extent reasonable to restrict the use of land next to or near the airport to uses that are compatible with normal airport operations").

[112]100 Nev. at 392, 685 P.2d at 950.

[113]*Id.*

BECKER, J., dissenting in part and concurring in part:

As a preliminary matter, I dissent to parts of the majority opinion that take statements out of context from *United States v. Causby*[1] and *Griggs v. Allegheny County*[2] to conclude that the mere presence of aircraft flying below 500 feet above ground level constitutes a physical occupancy of Sisolak's property. Neither case found that aircraft overflights, takeoffs or landings, in and of themselves, constitute a taking under the Fifth Amendment of the United States Constitution. Rather, it was the effect of the planes upon the owners' property that resulted in a taking. Likewise, the majority states that a regulation which requires the granting of an easement is automatically a taking under *Nollan v. California Coastal Commission*.[3] However, *Nollan* only holds that such a requirement may be a taking if the easement does not relate to the health, safety or welfare purpose of the regulation or is overly broad to accomplish that purpose.

Second, I dissent from the majority opinion's application of *Loretto v. Teleprompter Manhattan CATV Corp.*[4] to support its conclusion that a taking occurred in this case under the Federal Constitution. I believe that the correct federal analysis requires the use of *Penn Central Transportation Co. v. New York City*.[5]

I concur with the majority that a broader interpretation of the principles articulated in *Loretto* or *Penn Central* for airport approach zone cases may be warranted under the Nevada Constitution for two reasons: (1) commercial aircraft did not exist in 1864; and (2) prior to the Supreme Court's holding in *Causby*, landowners were generally considered to have an infinite interest in adjacent airspace.[6] Moreover, it is true that, at the time of the Nevada Constitution, the idea of a regulatory taking did not exist. It was created by the U.S. Supreme Court in the seminal case of *Pennsylvania Coal Co. v. Mahon*.[7] Finally, the establishment of landing patterns and approach zones and the regulation of physical structure heights in such zones necessarily regularly funnels aircraft over particular pieces of property rather than impacting all landowners in an airport's vicinity.

However, I dissent from the broad statement that our eminent domain provision was intended to give landowners greater protec-

---

[1]328 U.S. 256 (1946).

[2]369 U.S. 84 (1962).

[3]483 U.S. 825 (1987).

[4]458 U.S. 419 (1982).

[5]438 U.S. 104 (1978).

[6]*Causby*, 328 U.S. at 260-61.

[7]260 U.S. 393 (1922).

tion than that given under the Fifth Amendment of the United States Constitution. This contradicts over a century of precedent. In addition, other than general statements that the County Ordinances violated the Federal and State Constitutions, Sisolak never provided any analysis to support an argument that the Nevada Constitution provides more expansive rights under eminent domain. Such a broad, sweeping holding, without any reference to Nevada's constitutional debates or other significant supporting analysis, is unwise and unwarranted.[8]

For the reasons stated below, I do not agree that the County Ordinances in question, 1221 and 1599, authorize the physical invasion of Sisolak's property in violation of *Loretto*. Instead, the appropriate taking analysis is governed by the Supreme Court's opinion in *Penn Central*. Although, as discussed below, the Ordinances contain aspects that are troubling under *Penn Central*, neither side had the opportunity to fully litigate this case pursuant to *Penn Central*. Therefore, to be fair to all parties, I would remand the case to the district court with instructions to apply *Penn Central* after giving the parties time to present any additional evidence relevant to a *Penn Central* analysis. In addition, on remand, the parties could present additional arguments or analysis of how airport approach zones should be treated under the Nevada Constitution, through a broader reading of *Loretto* or *Penn Central*.

### Lingle analysis of takings cases

To avoid confusion in future cases, the U.S. Supreme Court clarified its eminent domain jurisprudence involving the relationship between land use regulations and the Fifth Amendment in *Lingle v. Chevron U.S.A. Inc.*[9] The *Lingle* Court delineated the elements necessary to establish a taking under each of the four different theories recognized by the Court involving land use regulations.[10] The Court noted that the four theories are encompassed in four cases, *Lucas v. South Carolina Coastal Council*,[11] *Loretto*, *Penn Central* and *Nollan*.[12] Each theory has key elements, which the Supreme Court outlined.

---

[8]In fact, a review of the Nevada constitutional debates indicates that the language added to the Nevada Constitution regarding compensation being "made, or secured" was intended to protect the government, not the landowner. *See* Debates & Proceedings of the Nevada State Constitutional Convention of 1864, at 60-63 (Andrew J. Marsh off. rep., 1866).

[9]544 U.S. 528 (2005).

[10]*Id.* at 538-39, 546-48.

[11]505 U.S. 1003 (1992).

[12]*Lingle*, 544 U.S. at 538, 546-47.

For a *Lucas* taking, the landowner must demonstrate that the regulation completely deprives the owner of all economically beneficial use of the property.[13] *Loretto* involves regulations that allow a permanent physical invasion of a landowner's property by the government or third parties.[14] A *Nollan* taking occurs when the granting of a land use application is conditioned upon concessions by a landowner, such as an easement, that go beyond the scope of the governmental interest the regulation is designed to protect.[15] Finally, *Penn Central* is used to analyze any regulation that does not fit in the other three categories. Under *Penn Central*, the effect of the regulation on a piece of property is measured on a case-by-case basis using several factors to determine whether the regulation constitutes a taking.[16]

Sisolak agrees that *Lucas* does not apply to his property since the Ordinances do not destroy all beneficial use of the property. He argues instead that granting height variances conditioned upon conveyance of an avigation easement under Ordinances 1221 and 1599 constitutes an unconstitutional exaction under *Nollan* and that the creation of approach zones and critical approach zones by the Ordinances permits planes to physically invade his property in violation of *Loretto*. Sisolak contends that a combination of these actions amounts to a taking. However, under *Lingle* and *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,[17] these theories cannot be combined to effect a taking.

I concur with Sisolak that the avigation easements imposed by Clark County against his property in the past, and as a condition of a variance grant in 2001, are unconstitutional exactions under *Nollan*. Ordinances 1221 and 1599 impose height restrictions to avoid creating aviation hazards for planes landing or taking off from McCarran Airport. The avigation easements go beyond this purpose because they also protect McCarran from future claims that noise and fumes from aircraft are creating a nuisance or destroying the existing use and enjoyment of the property.[18] However, Sisolak has failed to demonstrate any damages resulting from the overly broad easements because the easements themselves do not prohibit building above a certain height. Thus, he has no takings claim until the government attempts to enforce the easement. Rather, his remedy at this time is to invalidate the easement. It can-

---

[13]*Id.* at 538.

[14]*Id.*; *Loretto*, 458 U.S. at 440.

[15]*Lingle*, 544 U.S. at 546-47.

[16]*Id.* at 538-39.

[17]535 U.S. 302 (2002).

[18]In essence, protecting the government from a future claim of inverse condemnation under *Causby*, 328 U.S. 256.

not be used to support the damage award below. His claim must be analyzed under *Loretto* or *Penn Central*.

### *Loretto inapplicable*

The United States Supreme Court has emphasized that *Loretto* takings are a narrow category of takings.[19] To constitute a taking under *Loretto*, a regulation must grant, on its face, the government or a third party rights in the plaintiff's property.[20] A regulation that simply limits what a landowner can do with his or her property does not amount to a taking under *Loretto*.[21] Ordinances 1221 and 1599 impose building height restrictions upon property located within zones relating to runways at McCarran and other airports. They do not, on their face, establish any easement or other right to use a landowner's property.

While the majority is correct that landowners have an interest in the airspace adjacent to their real property, the right only exists to the extent necessary to the landowner's use and enjoyment of the property. The landowner does not have a separate interest in the air itself. As the Supreme Court said in *United States v. Causby*:

> The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land.[22]

The majority opinion is flawed when it concludes that creation of an approach zone gives aircraft the right to use Sisolak's airspace. The aircraft are entitled to use airspace below 500 feet above ground level for takeoff and landing, and a landowner's use of the airspace is concurrent with the right of aircraft overflights pursuant to federal[23] and state law.[24] The majority refers to these statutes but then ignores them to conclude that the Ordinances permit the planes to invade the airspace.

---

[19]*Lingle*, 544 U.S. at 538.

[20]458 U.S. at 426-28.

[21]*Yee v. Escondido*, 503 U.S. 519 (1992) (holding rent control regulations are not a physical invasion under *Loretto* because they only regulate what landowners can do with their property, they do not compel a landowner to lease property to any particular person).

[22]328 U.S. at 266.

[23]49 U.S.C. § 40102(a)(30) (2000).

[24]NRS 493.030, 493.040 and 493.050(1)(a).

Of course this is not to say that aircraft may fly over a property with impunity. Where aircraft operations interfere with a property's existing use, a claim for nuisance or inverse condemnation may exist based upon the extent of the damage created by the over-flights.[25] In addition, like any other regulation, airport height restriction regulations may go too far and result in a claim for inverse condemnation under the guidelines set forth in *Penn Central*.

### Penn Central analysis

When a regulation does not fall within one of the limited physical takings cases, it may still constitute a taking requiring compensation under *Penn Central*. *Penn Central* employs a fact-intensive ad hoc analysis to determine whether the impact of a regulation upon property rises to the level of a constitutional taking. As noted by the majority, the Supreme Court has identified several factors to be considered in *Penn Central* cases: (1) does the regulation impose restrictions generally upon all property within an area, or does it target certain landowners; (2) is the regulation designed to benefit a particular government project or enterprise; and (3) does the regulation destroy the landowner's investment-backed expectations in the property.[26] No one factor is controlling in the analysis.[27] In addition, before a claim under *Penn Central* may be litigated, the impact of the regulation on the property must be established.[28] Regulations that rely on government action to determine the effect of the regulation upon the property (such as variance procedures) are not ripe for court action until limits of the regulation are established.[29]

The County alleges that Sisolak's claim for inverse condemnation is not ripe for adjudication because Sisolak's only request for a variance was granted and there has been no definitive determination of how high a structure may be built upon the property. I disagree. The record reflects that the district court found, based upon affidavits and live and deposition testimony, that Sisolak could not build a structure exceeding sixty-six feet above ground level.[30] Although the County presented contrary evidence, weight

---

[25]*Causby*, 328 U.S. at 262-64.

[26]438 U.S. at 124.

[27]*Palazzolo v. Rhode Island*, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring).

[28]*Id.* at 619-21 (majority opinion).

[29]*Id.*

[30]When deciding jury instructions, the district court concluded that the County's evidence supporting heights exceeding one hundred feet above ground level was too speculative and instructed the jury that no building would be permitted above sixty-six feet above ground level. Although this was improper

and credibility decisions lie within the discretion of the district court.[31] Substantial evidence supports the district court's finding,[32] and thus, the matter is ripe for adjudication under *Penn Central*.

Several aspects of the Ordinances are troubling under *Penn Central*; namely, evidence suggests that the regulations were designed to (1) benefit a particular government project, the expansion of McCarran Airport; (2) avoid eminent domain proceedings; and (3) create approach zones that may burden specific pieces of property for a benefit conveyed to all property owners in Clark County. Moreover, the variance procedure is conditioned on an unconstitutional exaction easement. However, Sisolak presented no evidence on how the Ordinances impacted his investment-backed expectations. Because no factor is controlling and *Penn Central* requires a weighing of the factors, fairness requires allowing all parties to present any additional evidence that they may have before a final takings determination is made. I would therefore remand the case for further proceedings under *Penn Central*.

I concur with the majority holding that actual relocation is not necessary to award fees under the federal relocation act so long as the record establishes a nexus that the ordinances were enacted to further a particular project and that project is federally funded. I also concur in the conclusions regarding prejudgment interest.

MAUPIN, J., dissenting:

While I agree with the majority that this inverse condemnation action must be resolved under a regulatory takings analysis, I disagree that a per se regulatory taking has occurred. In my view, the district court should have ordered the parties to litigate this takings claim under *Penn Central Transportation Co. v. New York City*.[1]

### DISCUSSION

*Regulatory takings*

In line with the United States Supreme Court's recent decision in *Lingle v. Chevron U.S.A. Inc.*,[2] regulatory takings occur under federal takings jurisprudence when the government requires an owner to suffer a permanent physical invasion of property (*Loretto*

---

under *Loretto*, and the district court did not review the evidence for futility or exhaustion under *Penn Central*, given his statements, I see no point in remanding the case for this purpose as his ruling clearly reflects his findings regarding the evidence.

[31] *See City of Las Vegas v. Bustos*, 119 Nev. 360, 365, 75 P.3d 351, 354 (2003).

[32] *See id.*

[1] 438 U.S. 104 (1978).

[2] 544 U.S. 528 (2005).

*v. Teleprompter Manhattan CATV Corp.*),[3] when a regulation completely deprives an owner of ''all economically beneficial use'' of property (*Lucas v. South Carolina Coastal Council*),[4] when a regulation requires the conditioning of land use beyond that which the regulation is designed to protect (*Nollan v. California Coastal Commission*),[5] or when a regulation, which does not deprive the owner of all viable economic use, impacts the property to the degree that it interferes with legitimate property interests (*Penn Central*).[6] When the regulation at issue does not fit within the first three categories, the takings claim must be resolved under *Penn Central*.[7]

As stated in *Lingle*:

> Although our regulatory takings jurisprudence cannot be characterized as unified, [the three] inquiries (reflected in *Loretto*, *Lucas*, and *Penn Central*) share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights.[8]

The majority agrees that neither a *Lucas* nor *Nollan* taking has occurred. Rather, it concludes that, under *Loretto*, the height restriction ordinances at issue effected a permanent physical invasion of the subject property.

In my view, because the air traffic over this property comes and goes, the Ordinances in question have not operated as a permanent physical ouster. Rather, they establish height restrictions to buildings that are subject to a variance process. Accordingly, I conclude that *Loretto*, *Lucas* and *Nollan* are not implicated. Under this analysis, the matter should be remanded for resolution under *Penn Central* for determinations concerning (a) the regulations' economic impact, (b) the regulations' interference with investment-backed expectations, and (c) the character of the government action.[9] As discussed below, such a resolution would be subject to a preliminary determination of ripeness.

---

[3]458 U.S. 419 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking).

[4]505 U.S. 1003 (1992).

[5]483 U.S. 825, 831-32 (1987).

[6]438 U.S. 104 (1978).

[7]*See Lingle*, 544 U.S. at 538.

[8]*Id.* at 539.

[9]*Penn Central*, 438 U.S. at 124.

*Ripeness*

*Exhaustion*

A regulatory takings claim under *Penn Central* is generally not ripe without exhaustion of administrative remedies resulting in a ''final decision'' regarding the property owner's ability to develop his property.[10] In *Williamson Planning Commission v. Hamilton Bank*, the Supreme Court observed:

> Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause. Although ''[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty,'' this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.[11]

The final decision requirement ''responds to the high degree of discretion characteristically possessed by land-use boards in softening the strictures of the general regulations they administer.''[12] Accordingly, without a final regulatory decision applying the challenged regulation, a court cannot evaluate the economic impact of the regulation with regard to the extent it interferes with reasonable investment-backed expectations and, thus, cannot conduct the *Penn Central* examination without resorting to speculation.[13] A final decision requires, at a minimum, ''(1) a rejected development plan, and (2) a denial of a variance.''[14] Further, the application for development must be one that is meaningful, *i.e.*, not one that is for

---

[10]*Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 190, 195 (1985).

[11]*Id.* at 190-91 (citations omitted).

[12]*Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 738 (1997); *see also MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986) (''A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes.'').

[13]*Hamilton Bank*, 473 U.S. at 191.

[14]*Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454 (9th Cir. 1987) (even if a landowner has submitted development plans and been rejected, an applied regulatory taking case might still not be ripe; a landowner must submit a ''meaningful'' application for development); *see MacDonald*, 477 U.S. at 353 n.9 (''Rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews.'').

" 'exceedingly grandiose development.' "[15] Additionally, government "may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision."[16]

While I disagree with the majority that a regulatory per se taking has occurred in this instance, I do agree that *Loretto* and *Lucas* takings, like per se physical takings, do not require exhaustion of administrative remedies. However, because I conclude that the takings issue in this case should be resolved under *Penn Central*, the landowner, in my view, was required to prove to the trial court that he had exhausted his administrative remedies by submitting at least one plan for approval. In this case, the landowner concedes that he did not exhaust his administrative remedies before trial and that he cannot do so now.[17]

### Futility

A limited exception exists to "the final decision [exhaustion] requirement if attempts to comply with that requirement would be futile."[18] However, as one court has explained, a landowner seeking to establish futility carries the burden of proving that the exception applies. The landowner must establish that the potential denial of a development permit is more than a mere possibility; rather, "a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)."[19] Thus, for example, in *Lucas*, the Court noted that it would have been futile for the landowner to submit a request for a "special permit" when the regulatory agency stipulated that it would not grant such a permit.[20]

Because the height restriction ordinances here are subject to variance procedures, and because the evidence in the record that might support a claim of futility was largely speculative, in particular, the testimony of the Clark County Department of Aviation planner concerning hypothetical projects, I would remand this matter for a new trial, during which the district court would assess the

---

[15]*Kinzli*, 818 F.2d at 1455 (the futility exception is not triggered until at least one meaningful application for development is submitted and rejected; "[a] 'meaningful application' does not include a request for 'exceedingly grandiose development' " (quoting *MacDonald*, 477 U.S. at 353 n.9)).

[16]*Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001).

[17]The parties agree that the landowner has sold the subject property to a third party.

[18]*Herrington v. County of Sonoma*, 857 F.2d 567, 569 (9th Cir. 1988); *see also Strickland v. Alderman*, 74 F.3d 260, 265 (11th Cir. 1996).

[19]*Gilbert v. City of Cambridge*, 932 F.2d 51, 61 (1st Cir. 1991) (citations omitted).

[20]*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1012 n.3 (1992).

probative value of the evidence under the above futility analysis. Assuming an adequate showing of futility, the district court would then conclude the litigation under the *Penn Central* criteria.

## CONCLUSION

I realize that the majority has determined to apply state constitutional principles to this takings analysis. This is certainly a reasonable approach. Having said this, I do not believe it necessary to deviate from federal takings jurisprudence to justly evaluate whether a compensable regulatory taking has occurred and whether the matter is ripe for such a determination.[21] Thus, while I believe that the landowner can make out a regulatory takings case, he should do so under *Penn Central*.

---

[21]I wish to note my vigorous agreement with the majority's conclusion that the perpetual avigation easement conveyed to the County by Mr. Sisolak's predecessor did not abrogate his property interest in the airspace over the subject parcels. In my view, the County's arguments in that regard were completely without merit.

I finally agree that actual relocation is not necessary to award the landowner fees under the Uniform Relocation Assistance and Real Property Acquisition Policies Act.